[S. F. No. 2285.    In Bank.—February 15, 1904.]

## SAN FRANCISCO AND SAN MATEO ELECTRIC RAILWAY COMPANY, Appellant, v. JOSEPH H. SCOTT, Tax-Collector, and ASA R. WELLS, Auditor, of the City and County of San Francisco, Respondents.

TAXATION OF STREET RAILROADS—JURISDICTION OF STATE BOARD OVER "RAILROADS"—CONSTRUCTION OF CONSTITUTION.—Section 10 of article XIII of the state constitution, providing for the assessment of all "railroads" operated in more than one county by the state board of equalization, is not to be construed as including "street railroads," though operating in more than one county. [McFarland, J., and Henshaw, J., dissenting.]

ID.—DISTINCTION AS TO NATURE OF FRANCHISES.—"Railroads" operate under one general franchise obtained by compliance with the general railroad law, for purposes of general transportation, without any advantage of local traffic along the streets, and may be justly assessed and apportioned for taxes according to mileage. But "street railroads" are organized solely for the accommodation of local passenger traffic, and the franchises of a street railroad, operating as such in more than one county, are necessarily separate and distinct, and local in origin, situation, and character; and it would be an unjust discrimination against a city in which its franchise for a street railroad has much greater value than in the country, in going to a local village terminus in another county, to assess it only according to mileage.

ID.—LOCAL ASSESSMENT.—The assessment of the portion of a street railroad which operates in the city and county of San Francisco, and also in the county of San Mateo, of that portion of its property which lies in such city and county, together with its franchise to operate a street railroad therein, may be properly made by the assessor of such city and county. [McFarland, J., and Henshaw, J., dissenting.]

APPEAL from a judgment of the Superior Court of the City and County of San Francisco.    J. M. Seawell, Judge.

The facts are stated in the opinion of the court.

Morrison & Cope, for Appellant.

Franklin K. Lane, City Attorney, and W. I. Brobeck, Assistant City Attorney, for Respondents.

SHAW, J.—This is an appeal by the plaintiff from the judgment of the court below in favor of the defendant. This appeal is on the judgment-roll alone. The plaintiff is the owner of a street railroad running from the intersection of Market Street and Steuart Street, in the city and county of San Francisco, to the town of Baden, in San Mateo County, with a branch to Golden Gate Park, at the intersection of Eighteenth and Guerrero streets, a total distance of twenty-three miles, of which eighteen and four tenths miles is situated in San Francisco, and the remainder in the county of San Mateo. During the times here involved the defendant was operating the road in more than one county; that is to say, it was operated as a continuous line running from the terminus in San Francisco to Baden, in San Mateo County. The assessor of San Francisco for the year 1899 made an assessment of the property of the plaintiff, including its franchise, roadway, road-bed, rails, and rolling-stock situated in the county of San Francisco. In the same year the state board of equalization made a valuation of the entire line of the plaintiff's road, and apportioned the same between the county of San Mateo and the city and county of San Francisco, according to the mileage of the road situated in each county respectively. The question which of these two assessments is the one sanctioned by law is the sole question in the case.

It is conceded that, if the word "railroads," as used in section 10 of article XIII of the constitution, is to be construed to include street railroads, the assessment of the state board of equalization must prevail, and the judgment must be reversed. The entire section in question is as follows: "All property, except as hereinafter in this section provided, shall be assessed in the county, city, city and county, town, township, or district in which it is situated, in the manner prescribed by law. The franchise, roadway, road-bed, rails and rolling-stock of all railroads operated in more than one county in this state shall be assessed by the state board of equalization, at their actual value, and the same shall be apportioned to the counties, cities and counties, cities, towns, townships, and districts in which such railroads are located, in proportion to the number of miles of railway laid in such counties, cities and counties, cities, towns, townships, and districts."

At the time of the adoption of the constitution there was not within the state a street railway operated in more than one county. Nor was there any apparent probability that there ever would be such a street railroad. The Civil Code, at that time, classified street railroads and ordinary commercial railroads separately, designating one by the term "railroad" and the other by the term "street railroad." The constitutional convention was composed largely of lawyers, who must be presumed to have been familiar with the nomenclature used in the Civil Code. The street railroads then in operation were confined entirely to the limits of cities and towns. The debates in the convention show that there was there no suggestion that the provision in question was intended to refer to street railroads, nor any reference other than to ordinary commercial railroads. In view of these facts, it cannot be said that either the convention or the people in adopting this section of the constitution were looking forward to a possible condition, and adopting a regulation for the assessment of a possible street railroad which might at some future time be operated in more than one county. There was therefore clearly an absence of actual intention in using the phrase "railroads operated in more than one county" to make a provision which also should apply to street railroads, if, peradventure, in the future one should come within the description. If the word "railroads" is to be extended so as to include street railroads, it is not because of the actual intention of those who framed and adopted the constitution to give the word that meaning, but because of the rule of law that where a provision is made by law for a certain class of subjects, and thereafter a new but similar subject is created, coming within the general description, and within the particular purpose and object of the law, it is to be considered as having been intended to be included in the original description. Thus, for illustration, a statute which imposes a penalty for "furiously driving any sort of carriage" was held to include and apply to bicycles, although at the time the statute was adopted bicycles had not yet come into existence. (*Taylor* v. *Goodwin*, L. R. 4 Q. B. D. 228.)

A good deal is said in the briefs with respect to the rule of construction to be applied to such cases, but there is no better

statement of the rule to be found than that given by this court in *Railroad Commissioners* v. *Market-Street R. R. Co.*, 132 Cal. 678, in these words: "In order to correctly determine this question, we must look to the words used, the context, the object in view, and the évils that were intended to be remedied." The rule is stated in this language in *Massachusetts Loan etc. Co.* v. *Hamilton,* 88 Fed. 588, "The meaning of the word must always depend upon the context and the legislative intent of the statute in which it is used, and (must be ascertained) from the occasion and necessity of the law, from the mischief felt, and the object and remedy in view."

As to the word used, it is manifest from an examination of the numerous cases cited on each side of the question that the word "railroad" may or may not include street railroads, according to the circumstances, and that in order to determine whether it does or not, we cannot consider the word itself as of any consequence, but must in every case look to the "context, the object in view, and the evils intended to be remedied."

The context of the constitution as a whole, apart from this particular section, affords us little aid. It nowhere refers to street railroads in express terms. It was held in *Railroad Commissioners* v. *Market-Street R. R. Co.*, 132 Cal. 678, that the word, as used in sections 22 and 23 of article XII, providing for the supervision of railroads and railroad corporations by a board of commissioners, did not include street railroads. Yet it is not unlikely, notwithstanding what is said in the opinion in that case, that the same word, as used in some of the other sections in the same article, would be properly construed to include street railroads. We must therefore refer to the immediate context of the article and section in question, and to the "object in view, and the evils to be remedied."

The general subject of article XIII, in which the section involved occurs, is the taxation and assessment of property and persons. Section 1 declares the general policy of the law to be, that all property is to be taxed in proportion to its value, and that the value is to be ascertained in the manner provided by law. The general rule with respect to the manner of ascertaining the value is declared in the section

here involved to be, that all property shall be assessed by the local authorities of the place where it is situated. This general rule would suffice to give a uniform and just assessment of all ordinary property, but in considering the subject of the property of railroads extending from one county into another, and operated as a whole, as was the case with the greater number of the railroads other than street railroads then in operation in the state, it is manifest from the debates that the convention perceived that this method would cause much inequality in the valuation of the same kind of property, having substantially the same value, in the different counties, and would produce conflicts between the authorities of different counties concerning the exact location of the movable property, described as rolling-stock, on the day its liability to assessment accrued, and probably some double assessments of such property in the respective counties. These were the evils which the convention sought to remedy by the provision under consideration. The density of population and the value of lands at any point along the line of an ordinary railroad does not materially enhance the value of the roadway of that part of the line above its value in other places. Although it may cost more in one place than in another, its value for railroad purposes is substantially the same. The same is true of the road-bed and rails. Although absolute perfection may not have been attained, a substantially just and uniform assessment in the respective counties is thereby secured, and the result of the working of the method adopted has, on the whole, been reasonably satisfactory to the people in its application to this class of property of the ordinary railroads of the state.

Since the adoption of the constitution, the growth of the state in population and wealth, and the ingenuity of man in making applications of the power of electricity, has made feasible and profitable the operation of ordinary street railroads in more than one county. The railroad in question is strictly a street railroad. It is expressly found by the court that it is a street railroad throughout its entire length, and if at any place it operates upon a roadway obtained from private individuals, and not upon the public streets, or in any other manner than as a street railroad, that fact does not appear in the record. The question presented is whether or

not such a road comes within the object and purpose of the constitutional provision.

It is conceded, of course, that the mere matter of the motive power for the propulsion of the cars is entirely immaterial. There is nothing in the purpose of the provision, nor in the evils which it was designed to remedy, nor in its practical application, which gives to the means of moving the cars the least significance in the decision of the question before the court.

So, also, we think it must be conceded that with respect to the evils of double assessments, conflicting claims, and inequality in values between the different counties, there is no reason apparent why a street railroad should not be held to come within the scheme provided by the constitution for the assessment of railroads operating in more than one county.

It was chiefly upon these grounds that the decision was placed in the opinion first rendered in this case. If there were no greater distinctions between the two classes of railroads than these, the conclusion that street railroads come within the object and purpose of the constitutional provision would be correct. Upon further consideration of the subject, however, we are of the opinion that other differences exist which were not considered in the former prevailing opinion, and which are sufficient to prevent the operation of the rule of construction contended for by the appellant. That rule cannot properly be applied where the new subject possesses characteristics so different from the old that to bring it within the scope of the pre-existing law would cause serious and substantial injustice. The different character of the franchise possessed by one class of roads from that possessed by the other, and the very serious interference with one of the fundamental principles upon which the power of taxation rests, which would arise from the operation of the constitutional plan, present sufficient reasons why a street railroad should be considered as not within the terms of this section of the constitution. The franchise of an ordinary railroad is obtained upon terms and conditions equally applicable to all roads of its class by a compliance with the general law which empowers corporations to construct and operate a railroad between the designated *termini*, located, it may be, in counties widely separated. (Civ. Code, sec. 291.) At the time the

constitution was adopted the law provided that franchises for the construction and operation of street railroads along the streets and public highways could be obtained only from the governing body of the city or town in which it was situated. (Civ. Code, sec. 497.) The law has been changed in some respects since that time, but the substantial provision still remains that the franchise can only be obtained through the action of the council or governing body of the municipality. (Civ. Code, sec. 497; Stats. 1901, p. 265; Stats. 1903, p. 90.) This franchise, of course, cannot extend beyond the city limits, and it is made subject to special conditions imposed by the local authorities—conditions which may be different in the case of each railroad of this character. It gives no authority whatever for the operation of a street railroad in more than one county. The only way by which a company can operate a street railroad in more than one county is by obtaining separate franchises from the local authorities of the respective counties, so located that the ends of the two roads coincide at the county line, so that the two can be in fact operated as a continuous line running from one county into another. But the franchises must remain separate and distinct, and local in origin, situation, and character.

The incorporation of a street-railroad company, of course, gives the corporation the power to do the business of operating street railroads, or some particular street railroad, as the case may be, as a natural person might do, and this power is doubtless a part of its general corporate franchise. But it is not to this that we now refer, but to the special permission to lay tracks in the streets, without which the power included in the grant of incorporation cannot be exercised.

In the case of an ordinary railroad the right which it may acquire to operate its road along a public street is, strictly speaking, a mere right of way, similar to the right it may acquire from landowners along the route. It is a part of its roadway, and not a part of the franchise, within the meaning of the word in the phrase in question. It imposes no implied obligation upon the grantee or donee to facilitate the local public use of the street by carrying persons from place to place thereon. The right which a street railroad obtains from the city to lay its track and operate its road on a street, on the contrary, is the most valuable part of its franchise. It

carries the obligation to serve the public in the use of the street, and is in furtherance of the original use. It does not receive this franchise by becoming incorporated, as an ordinary road receives its franchise to operate its road between its termini, but obtains it afterward by special grant from the municipality, and the thing thus obtained includes both the roadway and the franchise.

It is plainly the general policy of the law that property situated in one county or city should be taxable in that county or city for local purposes for its actual value, and that that local subdivision alone should have the benefit of this value for the purpose of raising its revenue. This indeed is the basis of all local taxation, and it is recognized by the section in question, that the property which receives the benefit of local government shall pay its proportion of the expenses thereof, apportioned according to actual value. It would be a very anomalous condition of affairs, therefore, if a franchise granted by one municipality, and entirely local to that municipality, should be assessed by a system which would permit a part of its value to be taken from the assessment of the municipality in which it is situated and transferred to another municipality, and there made the basis of an assessment for the benefit of that local government. Yet this is precisely what the proposed system would do. If the differences in the amounts were very small as compared to the whole, as could justly be said in the case of an ordinary railroad, perhaps this would not be a sufficient reason for supposing that the constitutional convention did not intend to include street railroads in the scheme. But a consideration of the different circumstances existing in the case of the respective classes of railroads, and the difference in the character of business transacted by them, shows that in the case of street railroads the difference in value would be very considerable. A street railroad in a city, as its name implies, operates its cars over the streets in common with the public, and as a part, and in furtherance, of the public use to which such streets are dedicated. The value of the system does not rest to any great extent upon the value of the space of ground which is occupied by the track. That space is also subject to general public use as a part of the street, and, considered merely as land, the interest of the railroad therein is of very

little value. The valuable part of the privilege arises from the fact that the ground is already dedicated to public use, and is used for public travel; from the fact that it is situated on a public way along which persons are wont to travel from place to place, and that it is intended to facilitate this use and this travel by carrying persons to and fro along the street as they may desire. It is this local traffic from which the earnings of the company are derived. It is the existence of this demand and the opportunity to supply it, by reason of its situation on and along the street, which gives value to the privilege of using the street as a roadway. In this respect there is no similarity between a street railroad and an ordinary railroad. The latter does not do a local business, nor facilitate local travel along the street. If it occupies the streets at all, as it may do under permission of the local authorities, it is not for the purpose of serving a local use or travel from place to place along that particular street. It is in reality an obstruction to such local travel. It uses the streets merely as a convenient route by which to reach its depot, and usually it takes the street instead of a right of way over private land not from choice, but from necessity. Its use of the street has no relation whatever to the local public use, and the fact that it is on a street does not add to, but rather detracts from, the value for railroad purposes of that part of its roadway, and it adds nothing at all to the revenues received from the operation of the road.

It is easily seen that in the dense population of a city the value per mile of track of a street railroad must necessarily be very much greater than in the more sparsely populated country outside of the city. In the case of a street railroad operated partly within and partly without a city, whether in more than one county or not, it is evident that if the entire value of the franchise and roadway of the railroad as a whole is ascertained, and the amount divided between the portion inside the city and the part outside, in proportion to the length of track in each territory respectively, a large part of the value of property situated within the city would be arbitrarily taken from the city valuation and transferred to that of the county, thus, if the road is operated in more than one county, causing an injury to the city and a benefit to the county, which it cannot be supposed was intended. In

this particular case, for instance, if the value of the eighteen miles of the plaintiff's franchise, roadway, road-bed, and rails in San Francisco is eight thousand dollars per mile, and the five miles in San Mateo County is worth only four thousand dollars per mile, the total value in San Francisco would be one hundred and forty-four thousand dollars, and in San Mateo County twenty thousand dollars, and the only fair and just assessment would be upon those values in the respective counties. But the average value per mile of the entire road would be approximately $7,130, and, if valued by the arbitrary method provided in the constitution, the result would be that $15,655 of the value of the property within the city would be taken from the San Francisco assessment and added to that of San Mateo County, thus depriving the city of San Francisco of a part of the revenue to which it is entitled, and giving to San Mateo County revenue to which it has no just claim, and enabling the plaintiff to avoid city taxation to the extent of the difference.

The possibilities of escaping taxation in the particular case here before the court may be of slight importance to the plaintiff, because the rate of taxation may be substantially the same in the city and county of San Francisco as in San Mateo County, but in the case of a railroad operated in a city situated far from the county line the method of assessing such a railroad operated in more than one county would enable such a road to escape taxation upon a large proportion of the value of its property. For instance, in the county of Los Angeles a street-railroad system having lines extending in many directions throughout the city of Los Angeles might run a branch outside of the city, but within the county, for a distance of thirty miles before reaching the county line. So long as it was operated only within the county it would be assessed according to its value in the city and county, respectively, by the assessor of that county for county and state taxation, and by the assessor of the city for municipal purposes. But by extending the line for one mile beyond the county line, and thus making it a road operated in more than one county, the comparatively larger value of that part of the road situated within the city goes into the general sum, and becomes merely a part of the value of the entire system. The trackage within the city would then be valued at the

average value of the entire system, which would be very much less than the real value of the mileage within the city. This much of the city values would therefore be taken from the city assessment and added to the assessment for county purposes, and, to that extent, the road would entirely escape assessment for municipal purposes. For instance, if the value of the tracks within the city was one million dollars, and the value of the tracks outside of the city five hundred thousand dollars, the total length being sixty miles, one half in the city and one half outside, the average value per mile of the whole system would be twenty-five thousand dollars. By this plan the mileage within the city would be valued at only seven hundred and fifty thousand dollars, and the city would lose for assessment purposes two hundred and fifty thousand dollars of its value, and to that extent the railroad would escape taxation and the city would lose its legitimate revenue. We do not believe that the constitution was intended to give the opportunity for such consequences, and for these reasons we think the section does not apply to street railroads.

There has recently come into existence a certain class of railroads, known as interurban roads, which are a sort of hybrid, having in some respects the characteristics of the ordinary railroad, and in others those of the street railroad. Within the limits of the cities which they enter they usually pass along the streets, and perform the ordinary functions of street railroads, stopping where desired to let passengers on or off, and serving the public need for local street travel. Outside the cities, on their way from one city or town to another, they frequently travel upon a roadway obtained from private persons, not upon a public road, and stop, as in case of ordinary railroads, only at stations established by them for that purpose. They also often convey freight as well as passengers. Whether or not these railroads, when operated in more than one county, are to be classed as street railroads or as ordinary railroads to be assessed by the state board of equalization, and, if the latter, whether they may be attached to a system of street railroads, and so make the entire mileage of such system subject to assessment by the state board, or must, for the purpose of such assessment, be limited exclusively to the part of the system traversed by the

cars of the interurban line, are questions which do not here arise, and need not be considered. The railroad in question is not one of this class.

The judgment of the court below is affirmed.

Beatty, C. J., Lorigan, J., Angellotti, J., and Van Dyke, J., concurred.

McFARLAND, J., dissenting.—I dissent, and adhere to the former decision and to the opinion then delivered; and I desire to add only the following, which seems to be too obvious to be surmounted by any kind of reasoning: The word "railroad" is frequently used in the constitution without any other defining or qualifying phrase, and where the meaning of the word, standing alone, comes in question in determining the application of some provision of the law, it is no doubt occasionally difficult to decide whether, in the particular matter involved, it should be construed to include "street railroad." But in the provision here in question—"all railroads operated in more than one county in this state"—the word "railroads" does not stand alone; the important, significant, and controlling part of the phrase is "operated in more than one county." The thought in the minds of the framers of the constitution, as shown by the language used, was to provide for the assessment of a railroad, with its rolling-stock, franchises, etc., running through and being operated in more than one county. And the thing intended to be provided for is in its very nature applicable to any railroad which is operated in more than one county.

I do not see the force of the suggestion that the dense population of a city makes a mile of track within it more valuable than a mile in a more sparsely settled country outside of the city. The same fact exists as to all railroads. The great overland railroads pass through counties which are thickly settled and cities having dense populations, and also through almost entirely unsettled mountain and desert regions, and the parts of these railroads lying within the former are more valuable than those lying within the latter. If they were divided, for the purpose of taxation, into sections corresponding with county and city lines, cities and some counties would receive more revenue from taxation of these roads than they

do now.  But under that system other evils would occur; and the constitutional convention, after a full consideration of the whole matter, determined that the more practicable, just, and equitable way was to tax each railroad operated in more than one county, with its rolling-stock, etc., as a whole.  This being the rule declared by the constitution, it cannot be disregarded on the ground that it is not the best way to assess such a railroad.

Henshaw, J., concurred with McFarland, J.

The following is the opinion of the court in Bank rendered on the 1st of July, 1903, referred to in the dissenting opinion of Mr. Justice McFarland:—

HENSHAW, J.—This appeal is on the judgment-roll.  The facts are undisputed, and the single question presented for determination is whether under the constitution of this state the franchises, rails, and rolling-stock of a street railroad operated in more than one county should be assessed by the state board of equalization or by the assessors of the several counties through which the railroad passes.  It is conceded that, if the word "railroads," as used in section 10 of article XIII of the constitution of the state, includes street railroads, the judgment should be reversed.  The section of the constitution to which reference has been made reads as follows: ". . . The franchise, roadway, road-bed, rails, and rolling-stock of all railroads operated in more than one county in this state, shall be assessed by the state board of equalization at their actual value, and the same shall be apportioned to the counties, cities and counties, cities, towns, townships, and districts in which such railroads are located, in proportion to the number of miles of railway laid in such counties, cities and counties, towns, townships, and districts."

It has been said by this court (*Ferguson* v. *Sherman*, 116 Cal. 176) that the word "railroad," as used in law, is broad enough to include street railroads, and many cases have arisen where the courts have held that the word does in its signification include such.  Each case is to be determined upon its own facts, having in view the circumstances, the context, the presumed intention of the lawmakers, and the

general policy of the state in regard to the particular matter. There being no question, therefore, that the word employed by the constitution embraces in proper cases street railways, our inquiry is narrowed to a determination of the intention of the framers of our constitution, and here, by reference to the constitutional debates, all doubt upon the question would seem to be eliminated. The end sought to be attained was a just and uniform method of taxation for railroads operated in more than one county. The section of the constitution, as originally presented, provided that the value of all the property of all railroad corporations should be assessed by the state board of equalization. Much debate followed, and it was pointed out that where a railroad was operated in but one county the assessor of that county was as competent to fix the value as he was that of any other property within his territory; that there was an essential difference between railroads so operated and those which traversed two or more counties of the state. The debate, in short, revolved about the single question of assessment for purposes of taxation. Finally, the amendment was offered which now finds place in the constitution, and debate upon this followed, always upon the same lines, as to the wisdom and justice of the plan of assessment. For example, Mr. Estee, in opposition, protested ''because the very fundamental doctrines of taxation rest upon the proposition that every dollar shall be taxed by a rule which shall be uniform throughout the state.'' Mr. West, of Los Angeles, discussing the proposed amendment, and, answering Mr. Estee, declared: ''I fully agree with the gentleman that we should adopt a rule that will be uniform in its operation. But certainly I disagree with him when he says we cannot have the railroad property in this state assessed by a state board of equalization. In that particular it would be a state board of assessors. Now, it is well known that the railroad property is peculiar property in itself. It does not bear any relation to the localities as other property does. It is considered as an entirety. The rolling-stock and all belong to the road as a whole, and ought to be assessed as a part of the entire line. All the property used is a part of the road, and the value can be much better ascertained by assessing it as a whole.'' And Mr. Justice Van Dyke, at that time a member of the constitutional convention, opposing the

original section and favoring the amendment, said, amongst other things: "There are many railroads in this state, and gentlemen seem to forget, in their efforts to drive at the main railroad, that in some counties there are short lines of railroad for local purposes which will come within the provisions of this section as it now stands. Why take a local railroad in Humboldt County that runs but a few miles, and throw the assessment of that property upon the state board? It is not the office of that board. It ought to be assessed by the county assessor the same as all other property in Humboldt County. . . . For that reason I am in favor of the amendment proposed by the gentleman from Los Angeles."

It is thus an assured and ascertained fact that the framers of the constitution recognized a broad distinction for purposes of taxation between railroads operated in but one county and railroads operated in more than one county, and that they set forth a different scheme of taxation for the different kinds of roads. In *People* v. *Central Pacific R. R. Co.,* 105 Cal. 576, further differences and distinctions are pointed out in justification of the classification made by the constitution, and practical examples given of the difficulties that would arise were it attempted to enforce by delinquent tax sales the assessments, if made in the separate counties by the local assessors.

It may be here noted that the constitution itself nowhere employs the phrase "street railroad" or "street railway," but when it speaks at all upon the subject uses the word "railroad." True, some provisions could in their nature have no application to street railroads operated within a single city or a single county, but this is no argument against the proposition that, where the constitution speaks generally of railroads all railroads, of whatever class, which by fair interpretation and intendment come within the meaning of the word, are meant to be included. For, as was said by the supreme court of Maryland, in *Oler* v. *Baltimore etc. R. R. Co.,* 41 Md. 583, where it is decided that railroad did include street railroad, "Had they not been made parts of the law, it might have furnished an argument that would not have been without weight that such railroads were intended to be excluded from its operation; but we do not understand that their being in the law can furnish any sound reason for the exclusion of

other classes of railroads, when the language of its general provisions, as is the case with the law before us, is broad enough to embrace them.'' Nor should much weight be given to the argument that the framers of the constitution could not have had in contemplation such interurban and intercounty roads as now exist because at the time the constitution was adopted there were only steam railroads operating in one or more counties of the state, and street railroads running wholly within the streets of a single municipality, generally with horses for motive power. It is true that electricity as a motive power was not then in use, but no one would contend that a new or different mode of propulsion would operate to affect the terms of this constitutional provision. If any one of our present steam railroads running through several counties of the state, should change its motive power to electricity, it would hardly be contended that by reason of that change they were withdrawn from the operation of this provision, and it would be an altogether unjustifiably narrow construction of our constitution to hold that its provisions, or that this provision, must be construed solely in the light of facts existing at the time of its adoption. The constitution is the organic and governing law of our state. It is never to receive a technical construction like a common-law instrument or a statute. It is always to be so interpreted as to carry out the great principles of government which it embraces and expresses, or, as Judge Story says, ''A constitution of government does not and cannot from its nature depend in any great degree upon mere verbal criticism, or upon the import of single words. . . . While we may well resort to the meaning of single words to assist our inquiries, we should never forget that it is an instrument of government we are to construe, and that must be the truest exposition which best harmonizes with its design, its objects, and its general structure.'' (Black on Interpretation of Laws, p. 14.) It is in strict consonance with this principle of interpretation that courts hold, and that in this case it should be held, that the instrument was not fixed, set, and hardened upon the day of its adoption, but is, and was meant to be, flexible enough to meet the changing conditions of our civilization. The English cases are common where their statutes, which have something of constitutional force, have been held

to embrace new conditions, non-existent at the time of the passage of the act. Thus, in *Bishop* v. *North*, 11 Mees. & W. 418, a statute passed in 1792, of course long before the existence of steam railways, provided that the proprietor of any estate containing any mines of coal or other minerals could build a railway over the land of another for carrying his coals or other minerals, by first paying or tendering satisfaction for the damages to be thereby occasioned, and the question arose whether under this act a railway could be built over lands of another on which steam cars and locomotives were to be used. The court held: "I cannot think it [the act] can be qualified by showing that at the time of the passage of the act a particular species of railway unlike the one contemplated, was in use. The power is general to make railways over the lands or grounds of any person or persons making satisfaction for the damages to be occasioned thereby." And so, too, in *Taylor* v. *Goodwin*, L. R. 4 Q. B. D. 228, a statute passed before bicycles were known, and which imposed a penalty for "furiously driving any sort of carriage," was held to apply to the furious driving of a bicycle.

Electric roads themselves were first operated upon the streets of a municipality. They next extended out upon the suburban roads and county highways. They now run freely between counties. They are projected over all parts of the state, and, if the expressed conviction of many prominent engineers is to be credited, it will not be long before even between states they will to a great extent have supplanted the present steam railroads.

Nor can any well-founded distinction be made because they run, where possible, along and upon streets and highways. They do not always do so. They frequently traverse lands upon their own acquired rights of way; and when they are operated in two or more counties of the state, no reason appears why they should not be held to come within the provisions of the section of the constitution under consideration, and many reasons, as above pointed out, demand that they should be.