[Civ. No. 3364.   First Appellate District, Division Two.—October 5, 1920.]

THE CITY OF SAN DIEGO (a Municipal Corporation), Appellant, v. WILLIAM G. KERCKHOFF et al., Respondents.

[1] MUNICIPAL CORPORATIONS—POWERS OF CITY COUNCIL—ENUMERATION—MODE OF EXERCISE — CONSTRUCTION OF CHARTER. — Where the powers of a city council are enumerated at length in the charter, the city council has not the power to dispose of its streets and other public property except to such extent and in such manner as may be specified in such charter; and these powers being inherent in the city as a matter of municipal affair, the provisions of the charter must be strictly construed in favor of the city.

[2] ID.—SAN DIEGO—AUTHORITY TO ALLOW RAILROAD TO ENTER CITY. Under the provisions of the charter of the city of San Diego, the city council is authorized to allow a railroad company or corporation to enter the city, either for the purpose of finding a terminus there or for the purpose of passing through the city to reach another terminus.

[3] ID.—GRANTING OF RAILROAD FRANCHISES—APPLICATION OF BROUGHTON ACT—COMPETITIVE BIDDING.—Wherever the provisions of the Broughton Act (Stats. 1905, p. 777) have not been made inapplicable by conflicting charter provisions, the city council cannot grant a franchise to construct or operate a street or interurban railroad, or any other privilege, except a steam railroad, without competitive bidding.

[4] ID.—FRANCHISES — STREET RAILROADS — INTERURBAN RAILROADS — LAW GOVERNING.—The subject of granting franchises for street railroads being a municipal affair, and that subject being covered by the charter of the city of San Diego, the provisions of that charter with reference thereto control over the Broughton Act; but that charter being silent with reference to franchises for the operation of interurban railroads, the Broughton Act controls on that subject.

[5] ID.—SAN DIEGO—TO WHOM FRANCHISES MAY BE GRANTED.—Under subdivision 47 of section 1, article II, chapter 2, of the charter of the city of San Diego, the city council may permit a "railroad company or corporation" to enter the city and make its way to the water front, when that company or corporation has complied with the general law and obtained a franchise under section 465 of the Civil Code; but that charter does not authorize the granting of such a franchise for an unlimited term to two individuals who do not constitute either a company or a corporation.

[6] ID. — ACTION ON BOND — VALIDITY OF FRANCHISE — BURDEN OF PROOF.—In this action by the city of San Diego to recover on a bond·given to insure the performance of the terms and conditions of a certain franchise for the construction of a railroad in that city, it was incumbent upon the plaintiff to bring itself within the exception of the Broughton Act, and this it failed to do.

[7] ID.—ALIENATION OF PUBLIC LANDS—POWER OF SAN DIEGO COUNCIL.—Under the charter of the city of San Diego, the city council has not the power to alienate city lands dedicated ·to public use; neither has it the power to sell, convey, or lease city lands not so dedicated, except in accordance with the terms of subdivision 50 of section 1, article II, chapter 2, of the charter; and it has no power to grant a perpetual right of way over the lands of the city in any event.

[8] ID.—VOID FRANCHISE—PERFORMANCE BOND VOID.—Where a municipal franchise to construct a railroad is void, the bond given to insure the performance of that franchise is without consideration and void.

APPEAL from a judgment of the Superior Court of Los Angeles ·County. Fred H. Taft, Judge. Affirmed.

The facts are stated in the opinion of the court.

S. J. Higgins, City Attorney, Arthur F. H. Wright, Deputy City Attorney, and D. S. Hammack for Appellant.

O'Melveny, Milliken & Tuller for Respondents.

NOURSE, J.—This is an appeal by plaintiff from a judgment in favor of defendants in an action brought to recover the sum of fifty thousand dollars on a bond given to insure the performance of the terms and conditions of a certain franchise for the construction of a railroad in the city of San Diego. The plaintiff alleged the granting of the franchise by ordinance of the common council approved April 11, 1907, the acceptance by the grantees, the deposit of a check in the sum of twenty-five thousand dollars to insure the faithful performance of the terms and conditions of the contract, the return of the check by the common council upon the filing of the bond in suit, and the breach of the conditions of the bond. The amended answer, among other defenses, alleged that the bond was without consideration because the franchise which was granted by the common council was illegal and void, and put in issue the entire question

of the validity of the franchise. The trial court failed to find upon the question of want of consideration, but did find that the franchise was granted substantially in the manner alleged in the complaint. The conclusion of law is merely that the defendants are entitled to judgment; but if the facts found to be true are such as will lead to but one legal conclusion, this court may draw that conclusion without reversing the case for a new trial.

Appellant makes a great many objections to the findings made and the court's failure to find upon issues which are claimed to be material, and also makes numerous assignments of error in the rulings of the trial court on the admission of evidence. An examination of the entire record fails to present a case where the asserted errors have resulted in a miscarriage of justice; and as appellant could not recover on the bond in view of the invalidity of the franchise, as hereinafter pointed out, it would serve no purpose to return the case to the trial court on account of any of the asserted errors or to give further consideration to them here.

The attack upon the franchise is made upon two grounds: (1) That the common council did not comply with the restrictions of the charter of the city of San Diego or of the state law in making the grant; and (2) that public property of the city was given to the grantees without compensation and in violation of the express provisions of the municipal charter.

The provisions of the municipal charter relating to the granting of franchises are contained in article II, chapter 2, section 1, subdivisions 46 and 47, and in section 9 of the same chapter, reading as follows:

Subd. 46. "To grant authority for a term not exceeding twenty-five years to construct street railways and lay down street railroad tracks upon or over any of the streets of said city, upon which cars may be propelled by horses, mules, steam, or other motive power, or by wire ropes running under the street and moved by stationary engines, and on such conditions as may be required by this charter, or by ordinance, and from time to time to establish, alter, and regulate the rates of fare to be charged by any person, company, or corporation to which authority may be granted." (Stats. 1905, p. 908.)

Subd. 47. "To allow any railroad company or corpora-
tion to enter said city, and make its way to the waterfront
at the most convenient point for public convenience; but no
exclusive right, franchise, or privilege shall be granted to
such railroad company; and the use of all such rights, priv-
ileges, and franchises shall at all times be subject to regu-
lation by the common council. Every ordinance granting
such right, privilege, or franchise shall be upon the condi-
tions that said company or corporation shall pave and keep
in repair the street between the rails of each track, and also
between the tracks, and for at least two feet on each side of
the same, including switches, turnouts, and side-tracks, and
that said company or corporation shall allow any railroad
company or corporation to which a similar right, privilege,
or franchise may be granted, to use in common with it the
same track or tracks upon such terms as the common council
shall determine." (Stats. 1889, p. 655.)

Sec. 9. "The common council shall not grant authority
to construct a street railway or lay down street railroad
tracks upon or over any of the streets of said city except
in the manner and on the terms following, viz.": (Here
follow provisions for the filing of an application, publication
of notice thereof, invitation for bids, and the award to the
best bidder.) (Stats. 1889, p. 658.)

The franchise granted to two individuals the right to con-
struct "a railway track or tracks together with all neces-
sary side-tracks, turnouts and switches, and any and all other
things necessary and incident to railway construction, main-
tenance and operation, through, over, across, upon and along
any and all public avenues, plazas, streets, alleys, highways
and pueblo, tide, submerged and overflow or other lands be-
longing to the city of San Diego on the general route herein-
after described, and to use, maintain and operate said rail-
way by steam, electricity or other motive power."

The trial court having found that the city suffered no
damage from the abandonment of the franchise, the ques-
tion is whether the city may still exact the penalty of the
bond if no consideration passed to the grantees and no in-
jury was suffered by the city. The attack upon the fran-
chise goes to the manner in which it was granted. The
argument is that, as the mode is the measure of the power,
a grant which is not made in accordance with the prescribed

mode is void.   (*Zottman* v. *San Francisco*, 20 Cal. 96, 101, [81 Am. Dec. 96]; *Pacific Electric Ry. Co.* v. *Los Angeles*, 118 Fed. 746, 753.)

It cannot be ascertained from the franchise whether the grant covered the right to construct and maintain a street railroad, an interurban line, or a commercial steam railroad. It is conceded that the council did not comply with the provisions of section 9, and that if the right to construct and maintain a street railroad was given the franchise is void. On behalf of appellant it is argued that the council intended to grant a franchise to construct and maintain a steam railroad, because the grantees were authorized to operate the road "by steam, electricity or other motive power." On behalf of respondents it is argued that the franchise contemplated either a street railway or an interurban line, and that, if the former, the franchise was void for noncompliance with the provisions of section 9 of the charter, quoted above, and, if the latter, it was void for noncompliance with the act of March 22, 1905 (Stats. 1905, p. 777), commonly known as the Broughton Act.

The argument of appellant is that the council found its power to grant the franchise in the provisions of section 47, which reads, in part: "To allow any railroad company or corporation to enter said city, and make its way to the waterfront." [1] Inasmuch as the powers of the council are enumerated at length in the charter, it must follow that the municipality has withheld from the council power to dispose of its streets and other public property except to such extent and in such manner as may be specified in the charter. These powers being inherent in the city as a matter of municipal affair, the provisions of the charter must be strictly construed in favor of the city. [2] So construing them, it follows that the council is authorized to allow a railroad company or corporation to enter the city, either for the purpose of finding a terminus there or for the purpose of passing through the city to reach another terminus. This is in consonance with the decision of the supreme court in *People* v. *Craycroft*, 111 Cal. 544, [44 Pac. 463], wherein it was held that the provisions of the act of March 23, 1893 (Stats. 1893, p. 288), prescribing the terms and conditions upon which a franchise might be granted "to construct or operate railroads along or upon any public

street," did not apply to a steam railroad which must pass through a city or town in order to construct and operate its road between fixed termini.

[3] The provisions of the Broughton Act, as in force at the time the franchise was granted, were, generally, that "Every franchise or privilege . . . to construct or operate *street* or *interurban railroads* upon any public street or highway . . . *or to exercise any other privilege whatever* . . . *except steam railroads* . . . shall be granted upon the conditions in this act provided, and not otherwise." (Stats. 1905, p. 777.) ·The sections following provide in detail a plan for letting such franchises upon competitive bidding. Wherever this act had not been made inapplicable by conflicting charter provisions, the council could not grant a franchise to construct or operate a street or interurban railroad, or any other privilege except a steam railroad, without competitive bidding. Any franchise granted otherwise would be void.

The history of this legislation shows that the original act of 1893 read: "Every franchise or privilege to . . . construct or operate *railroads* . . . or to exercise any other privilege whatever." (Stats. 1893, p. 288.) In March, 1896, the supreme court, in *People* v. *Craycroft, supra,* held that the act did not apply to a commercial railroad desiring "to make a connection through the town of those portions of its road extending upon either side of the town to its opposite termini." In this connection the court said: "The builder of the road must own and operate the whole line; the right to do so is part of its corporate franchise, and how is it possible that any other person or corporation can acquire the right to construct, and own and operate, as a distinct and independent road and franchise, that part of the road necessary to connect its two ends? This law was not intended to apply to such a case, but only to those cases—as of street railroads—in which *bona fide* competition is possible." And again: "It is the policy of this state to encourage the building of railroads, and a corporation complying with the statutory prerequisites acquires, among other things, the right to construct and operate its road between the termini named in its articles of incorporation. In the exercise of this right it may pass through cities and

towns along its route, if they are willing to grant the privilege.''

Immediately following this decision the legislature, in 1897, amended section 1 of the Broughton Act to read in part as follows: ''Every franchise or privilege . . . to construct or operate *street railroads* . . . or to exercise any other privilege whatever . . . except *steam railroads.*'' (Stats. 1897, p. 135.)

This act was superseded by the act of 1901 (Stats. 1901, p. 265), which in turn was amended in 1903 (Stats. 1903, p. 90), but without material change. In 1905 the act in force when the franchise was granted superseded the earlier act and for the first time included interurban railroads in the franchise restrictions.

In view of this legislation and the rule of the supreme court, as announced in the Craycroft case, it cannot be doubted that, unless controlled by charter provisions to the contrary, no city could grant without competition a franchise for any privilege to construct or operate a railroad within its limits, unless such railroad came within the meaning of a *steam railroad* as that term is used in the act and explained in the decision of the court. The exception contained in the act having been inserted immediately following the court's decision, it would seem apparent that the legislature had reference to the character of railroad covered by the decision—that is to say, a commercial railroad for the carrying of passengers and freight over a private right of way between fixed termini without regard to the motive power, but running for some distance at least outside of city limits—such a road as that contemplated by the sections of the Civil Code, 454–494, inclusive. These sections, it will be noted, come under title III, headed ''Railroad Corporations,'' chapter 1 of which relates to ''Officers and Corporate Stock,'' chapter 2, ''Enumeration of Powers,'' and chapter 3, ''Business, How Conducted.'' Title IV, including sections 497–511, is headed ''Street-railroad Corporations,'' showing a clear intention on the part of the legislature to distinguish between these two enterprises. The interurban railroads, which were included in the Broughton Act of 1905, are not mentioned in the code, but were treated by the supreme court in *San Francisco etc. Ry. Co.* v. *Scott,* 142 Cal. 222, 232, [75 Pac. 575, 583], where the court said: ''There has

recently come into existence a certain class of railroads, known as interurban roads, which are a sort of hybrid, having in some respects the characteristics of the ordinary railroad, and in others those of the street railroad. Within the limits of the cities which they enter they usually pass along the streets, and perform the ordinary functions of street railroads, stopping where desired to let passengers on or off, and serving the public need for local street travel. Outside the cities, on their way from one city or town to another, they frequently travel upon a roadway obtained from private persons, not upon a public road, and stop, as in case of ordinary railroads, only at stations established by them for that purpose. They also often convey freight as well as passengers.''

The decision in the Scott case was rendered in February, 1904, and, no doubt, accounts for the inclusion of interurban railroads in the act of March, 1905, above noted. The court expressly declined to determine whether such a road was to be classed as a street railroad or as an ''ordinary railroad,'' but did decide that when a ''franchise'' had been granted to construct and operate a railroad over designated public streets within the city, though the line continued outside the city to a terminus in another county, it was nevertheless a street railroad and not subject to the jurisdiction of the state board of equalization for taxation purposes.

[4] As has heretofore been stated, the municipal charter of San Diego covered the subject of granting franchises for street railroads at the time respondents' grant was made. That subject being a municipal affair, the charter provisions controlled over the Broughton Act. (*Sunset Tel. & Tel. Co.* v. *Pasadena,* 161 Cal. 265, 282, [118 Pac. 796].) If the franchise was for the operation of an interurban railroad, the Broughton Act controlled, because on that subject the municipal charter was silent. (*Clouse* v. *San Diego,* 159 Cal. 434, 437, [114 Pac. 573].) It is conceded that neither the charter nor the Broughton Act was followed in so far as they relate to street or interurban railroads. The case of appellant then rests upon the argument that a *steam railroad franchise* was granted. Bearing in mind that the motive power is not the determining factor, an examination of the record fails to disclose anything which would indicate that

the character of railroad contemplated in the *exception* in the Broughton Act or in subdivision 47 of the charter was intended. The ordinance purported to grant a *franchise* coupled with a perpetual right of way over certain public property. The franchise of a street railroad finds its origin in the action of the municipality—it is a contract between the city and the grantee. The franchise of the ordinary steam railroad comes from the Civil Code, section 465, which gives to every railroad corporation power to lay out its road and to construct and maintain the same across, along or upon any street, avenue, or highway. By section 470 of the Civil Code, the consent of the city authorities must be had to use the streets in an incorporated city, but this consent is more in the nature of a permit than a franchise. The distinction is clearly drawn by the supreme court in *San Francisco etc. Ry. Co.* v. *Scott,* 142 Cal. 222, 228, [75 Pac. 575, 581], where it is said: "In the case of an ordinary railroad the right which it may acquire to operate its road along a public street is, strictly speaking, a mere right of way, similar to the right it may acquire from land owners along the route. It is a part of its roadway, and not a part of the franchise, within the meaning of the word in the phrase in question. It imposes no implied obligation upon the grantee or donee to facilitate the local public use of the street by carrying persons from place to place thereon. The right which a street railroad obtains from the city to lay its track and operate its road on a street, on the contrary, is the most valuable part of its franchise. It carries the obligation to serve the public in the use of the street, and is in furtherance of the original use. It does not receive this franchise by becoming incorporated, as an ordinary road receives its franchise to operate its road between its termini, but obtains it afterward by special grant from the municipality, and the thing thus obtained includes both the roadway and the franchise."

The framers of the San Diego charter recognized this distinction in the enactment of subdivision 47, which reads in part: "To allow any railroad *company* or *corporation* to *enter* said city, and make its way to the waterfront at the most convenient point for public convenience." The franchise of a street railway is limited by subdivision 46 to twenty-five years. A railroad company may, so far as the

charter is concerned, be allowed to enter the city for an un-
limited time. By subdivision 46 a street railroad franchise
may be granted to "any *person*, company or corporation";
by subdivision 47 the right to enter the city may be granted
to "any railroad *company* or *corporation*." In the case of
the former the franchise can be granted only after bids have
been received in accordance with notice given; as to the
latter, the permit may be given without these restrictions.
[5] Reading subdivision 47 of the charter with the sections
of the Civil Code relating to railroad corporations (secs
454–494 and secs. 291 and 292 relating to the amount of
capital stock of a railroad corporation which must be sub-
scribed and paid into the treasury), the only reasonable in-
terpretation of the charter section is that, when a railroad
corporation has complied with the general law and obtained
a franchise under the Civil Code, section 465, the common
council may permit it to enter the city of San Diego and
make its way to the waterfront. The evident purpose of
the charter framers in omitting the word "person" from
this subdivision was to withhold that privilege from all in-
dividuals who had not brought themselves under the restric-
tions and the limitations of the code sections. The fran-
chise was granted for an unlimited term to two individuals
who did not constitute either a company or a corporation.
It was not authorized by the charter. Appellant argues that
the council found its power in section 11 of article XI of the
constitution, which gives to each city power to enforce local
police regulations. But by this same section the exercise of
such power is limited to such regulations as are "not in
conflict with general laws." Thus, if the charter is silent
upon the matter, and the general laws prescribe the mode
by which the power may be exercised, the grant contained
in the constitution is limited to that extent.

That the Broughton Act itself is not a grant of any right
or franchise cannot be disputed. (*Sunset Tel. & Tel. Co.* v.
*Pasadena,* 161 Cal. 272, [118 Pac. 796].) But it prevented
the granting of any privilege included in its terms in any
other manner than that prescribed. (*McGinnis* v. *Mayor,*
153 Cal. 711, [96 Pac. 367].) Section 465 of the Civil Code
is a grant to railroad corporations; section 470 of the Civil
Code is a limitation upon such grant, but is not in itself a
grant of power to the city or of any right or privilege to

the corporations; subdivision 47 of the charter is a limited grant of power to the city. It does not, however, refer to "steam railroads" and is not in conflict with the Broughton Act.

There was, therefore, no express statutory or charter grant of power to give a franchise to individuals for such a railroad as that contemplated by the ordinance without competition. If the power existed by implication, it was nevertheless limited by the provisions of the Broughton Act, because the franchise was one "to exercise any other. privilege" within the meaning of the act. If the privilege sought was for a "steam railroad" within the exception of the Broughton Act, the power of the city was limited by subdivision 47 of the charter to the right to grant the privilege to a "railroad company or corporation." In this connection, it should be said that, except as hereinafter noted, there was nothing in the ordinance inconsistent with a grant to construct and operate a street railroad, and that, if the council had followed the charter provisions relating to street railroad franchises, the ordinance would have been a valid exercise of the charter powers. **[6]** Furthermore, it was incumbent upon the city, in this action, to bring itself within the exception of the Broughton Act, and this it failed to do.

**[7]** Another objection to the ordinance which has been raised by the pleadings is that it granted to these individuals a right of way in perpetuity over public property of a strip of land one hundred feet wide and two miles long. This grant was made without consideration and without compliance with the express provisions of subdivision 50 of the same section of the charter, which permits the council "to provide for the sale and conveyance, or lease, of all lands now or hereafter owned by said city not dedicated or reserved for public use . . . at public auction after publication of notice thereof." Thus if the city lands were dedicated to public use, they could not be alienated; if not so dedicated, they could be sold, conveyed, or leased only in accordance with the terms of subdivision 50. The council had no power to grant a perpetual right of way over the lands of the city in any event.

**[8]** From the foregoing it follows that the purported franchise was void, and that, as it was the basis of the bond sued on, the bond was without legal consideration. For

this reason no recovery can be had upon the bond. Other points raised do not require consideration. The judgment is affirmed.

Brittain, J., and Langdon, P. J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on December 2, 1920.

Angellotti, C. J., Shaw, J., Lawlor, J., Wilbur, J., and Lennon, J., concurred.