[L. A. No. 19311. In Bank. Aug. 13, 1948.]

COUNTY OF LOS ANGELES, Appellant, v. SOUTHERN CALIFORNIA TELEPHONE COMPANY (a Corporation), Respondent.

J. H. O'Connor, Harold W. Kennedy, County Counsel, S. V. O. Prichard, First Assistant County Counsel, A. Curtis Smith and Gerald G. Kelly, Deputy County Counsel, for Appellant.

Pillsbury, Madison & Sutro, Lawler, Felix & Hall, Oscar Lawler, John W. Holmes and Francis N. Marshall for Respondent.

O'Melveny & Myers, Louis W. Myers, Pierce Works, Rodney K. Potter and Jackson W. Chance, as Amici Curiae on behalf of Respondent.

GIBSON, C. J.—By this action for an injunction, plaintiff county is seeking to compel defendant telephone company to obtain a county franchise and to pay for the privilege of maintaining its lines and poles on streets and highways outside of incorporated areas. Defendant claims it was granted this privilege by section 536 of the Civil Code as amended in 1905,* and that it is not required to obtain a franchise from the county. The trial court determined that defendant had a valid franchise from the state and denied an injunction. The county has appealed from the judgment.

In the years 1903-1905, the county issued five franchises for telephone lines, and these were thereafter conveyed to the defendant telephone company. Three of the franchises terminated before this action was commenced, and a fourth

---

*Section 536 of the Civil Code as amended in 1905 provides that "Telegraph or telephone corporations may construct lines of telegraph, or telephone lines along and upon any public road or highway, along or across any of the waters or lands within this state, and may erect poles, posts, piers, or abutments for supporting the insulators, wires, and other necessary fixtures of their lines, in such manner and at such points as not to incommode the public use of the road or highway or interrupt the navigation of the waters."

expired before the trial. The fifth franchise by its terms is still in effect, but the area which it covers was expressly excluded from this controversy by the complaint. Only one of the franchises required the payment of a percentage of the gross receipts derived from the use of the privilege, and the company made the payments, as provided, until expiration of the period specified therein. The company and its predecessors, at least since 1909, have specifically relied on section 536 for their authority when applying for permits to locate or change poles or lines on the highway. Further, from 1905 until about the time of the filing of the complaint, except for six years, the county assessed and levied property taxes on the franchise claimed by defendant and its predecessors under that section.

The questions to be decided are: First, what is the effect of section 536? Second, was section 536 repealed by the Broughton Act?\* Third, if section 536 is construed as granting a franchise to defendant, is it unconstitutional (a) as being a gift in violation of sections 22 and 31 of article IV of the California Constitution or (b) as denying equal protection of the laws and constituting an invalid grant of special privileges in violation of the 14th Amendment to the federal Constitution and sections 11 and 21 of article I and section 25 of article IV of the California Constitution?

█ Section 536 was originally enacted at the time of the adoption of the codes in 1872, but similar provisions had existed for many years prior thereto. (See Stats. 1850, p. 369; Stats. 1857, p. 171.) When first enacted the section applied only to telegraph corporations. It made no mention of *telephone* companies, and it did not grant any rights to such companies prior to 1905, when the section was repealed and reenacted to apply to both telegraph and telephone corporations. (See *Sunset Tel. & Tel. Co.* v. *Pasadena*, 161 Cal. 265 [118 P. 796].) As applied to *telegraph* companies, it has been held that section 536, as it existed prior to 1905, was

---

\*The Broughton Act (Stats. 1905, p. 777; 1 Deering's Gen. Laws, Act 2720) provides: ''Every franchise or privilege to erect or lay telegraph or telephone wires, to construct or operate street or interurban railroads upon any public street or highway . . . or to exercise any other privilege whatever hereafter proposed to be granted by boards of supervisors . . . or other governing or legislative bodies of any county . . . except telegraph or telephone lines doing an interstate business . . . shall be granted upon the conditions in this act provided, and not otherwise.'' One of the conditions specified is the payment of 2 per cent of the gross receipts.

effectual to grant a state franchise, and that the use of the highways, and the maintenance and operation of the telegraph system, constituted an acceptance of the provisions of the statute and resulted in a contract between the company and the state which was secured by the federal Constitution against impairment by subsequent state legislation. (See *Western Union Tel. Co.* v. *Hopkins,* 160 Cal. 106 [116 P. 557]; *Western Union Tel. Co.* v. *Visalia,* 149 Cal. 744 [87 P. 1023]; *Postal Tel. Cable Co.* v. *Los Angeles,* 160 Cal. 129 [116 P. 566]; *Sunset Tel. & Tel. Co.* v. *Pomona,* 172 F. 829, 837; *Postal Tel. Cable Co.* v. *Railroad Com.,* 200 Cal. 463 [254 P. 258].)

The purpose of the change in 1905 was to add *telephone corporations* to the section, and, except for this extension, there is nothing in the amendment to indicate any intention to alter the effect and operation of the statute.* (See *City of Salinas* v. *Pacific Tel. & Tel. Co.,* 72 Cal.App.2d 494, 497 [164 P.2d 905].) In view of the construction given to this section as it existed prior to 1905, and the absence of other changes, it must be held that the intention was to offer the grant of a franchise to telephone as well as telegraph companies upon acceptance by the construction and operation of communication facilities.

 A question has arisen, however, as to whether section 536 was repealed by the Broughton Act, which was adopted at the same session at which section 536 was amended. The act does not contain any provision expressly repealing that section, and it was not repealed by implication unless the statutes are so repugnant they cannot stand together. The Legislature was considering the statutes at the same time and must have intended to give effect to both. In *County of Inyo* v. *Hess,* 53 Cal.App. 415 [200 P. 373], it was held that section 536 was not repealed by the Broughton Act but that the statutes could operate in separate fields. The court said at page 425 "that under and by virtue of the provisions of section 536 of the Civil Code, telephone corporations are granted the right and privilege to use the public highways over which to construct and operate lines of telephone wires,

---

*It has been held, however, that since section 536 did not confer any rights on *telephone* companies prior to its reenactment in 1905, the amended section did not grant such companies a franchise to use the streets of a city which previously had been given full control of its streets under a freeholders' charter. (*Sunset Tel. & Tel. Co.* v. *Pasadena,* 161 Cal. 265 [118 P. 796]; *City of Salinas* v. *Pacific Tel. & Tel. Co.,* 72 Cal.App.2d 494 [164 P.2d 905].)

free from any grant made by subordinate legislative bodies, and unrestricted by the provisions of the Broughton Act. . . .'' The court also declared that section 536 was intended as a legislative grant limited in operation to telegraph and telephone *corporations*, as distinguished from *individuals*. This construction is supported by the specific terms of the section which refers only to ''telegraph or telephone corporations.''

The Broughton Act, unlike section 536, does not grant any right or privilege, nor does it purport to empower or authorize boards of supervisors to grant franchises or other privileges, but instead indicates an intent to limit and restrict the powers which may have been granted under other laws by specifying the procedure which must be followed and the conditions which must be imposed in the granting of any franchises by subordinate legislative bodies. The court stated in *Oro Electric Corp.* v. *Railroad Com.*, 169 Cal. 466, at pages 482-483 [147 P. 118], that ''this act merely places restrictions upon the granting of franchises, where the power to grant such franchises exists otherwise. As was said in *Sunset Tel. & Tel. Co.* v. *Pasadena*, 161 Cal. 265, 272 [118 P. 796], the 'whole purpose' of the act 'was to prescribe the method and conditions upon which the franchises included within its terms might be granted by the legislative body authorized by law to make the grant.' The act does not authorize any board or council to grant a franchise.'' (See also *McGinnis* v. *Mayor and Common Council*, 153 Cal. 711, 713-714 [96 P. 367]; *City of San Diego* v. *Kerckhoff*, 49 Cal.App. 473, 482 [193 P. 801].)

Since the Broughton Act is thus limited in operation to those franchises which subordinate legislative bodies are authorized to grant under other laws, it cannot be construed as applicable to statutory franchises which are not granted by such bodies but which, as in the case of the franchise involved here, are granted directly by the Legislature. The two statutes were enacted for separate purposes and occupy separate fields, and both can be given effect. There is, therefore, no such repugnance between the acts as would require a determination that there was any implied repeal. Accordingly, defendant is entitled to use the streets and highways in unincorporated areas of the county, by reason of its franchise under section 536, unless that section, as claimed, is unconstitutional.

The county contends that the Legislature is prohibited by

384

sections 22 and 31 of article IV of the California Constitution* from granting a free franchise and that since no compensation is required to be paid for the rights acquired under section 536, the statute is unconstitutional. It does not follow, however, that because telephone and telegraph companies are permitted without charge to construct lines along the highways the privilege granted is a gift. The franchise is conditioned not only on the establishment of lines by a telegraph or telephone corporation, but also, by necessary implication, on the continued operation of the system. ▮ The grant under section 536 must be construed in favor of the state. (Civ. Code, § 1069.) As so construed it must be held to be a grant to use public roads and highways so long as telegraph or telephone communication service is continued and that the acceptance of the franchise involves an assumption of the duty to furnish proper and adequate communication service to the public. Obviously, the state receives a substantial benefit from the continued operation of such a system, and the question is whether, notwithstanding that benefit, the grant comes within the constitutional prohibition.

▮ Section 536 has been judicially construed by many decisions of this court, and it has been uniformly held that the statute is a continuing offer extended to telephone and telegraph companies to use the highways, which offer when accepted by the construction and maintenance of lines constitutes a binding contract based on adequate consideration, and that the vested right established thereby cannot be impaired by subsequent acts of the Legislature. (*Western Union Tel. Co.* v. *City of Visalia,* 149 Cal. 744 [87 P. 1023]; *Western Union Tel. Co.* v. *Hopkins,* 160 Cal. 106 [116 P. 557]; *Western Union Tel. Co.* v. *County of Los Angeles,* 160 Cal. 124 [116 P. 564]; *Postal-Telegraph Cable Co.* v. *County of Los Angeles,* 160 Cal. 129 [116 P. 566]; *Postal Telegraph-Cable Co.* v. *Los Angeles,* 164 Cal. 156 [128 P. 19]; *Sunset Tel. & Tel. Co.* v. *Pasadena,* 161 Cal. 265 [118 P. 796]; *Postal-Tele-*

---

*Article IV, section 22, provides that ''no money shall ever be appropriated or drawn from the State Treasury for the purpose or benefit of any corporation, association, asylum, hospital, or any other institution not under the exclusive management and control of the State as a state institution nor shall any grant or donation of property ever be made thereto by the State.''

Article IV, section 31, provides that '' [t]he Legislature shall have no power . . . to make any gift or authorize the making of any gift, of any public money or thing of value to any individual, municipal or other corporation whatever.''

*graph Cable Co.* v. *Railroad Com.*, 200 Cal. 463 [254 P. 258] ;
see *People* v. *Turlock Home Tel. & Tel. Co.*, 200 Cal. 546 [253
P. 1108] ; *County of Inyo* v. *Hess*, 53 Cal.App. 415 [200 P.
373] ; *State of California* v. *Marin Mun. W. Dist.*, 17 Cal.2d
699 [111 P.2d 651].)

The nature of the rights and privileges arising from sec-
tion 536, as interpreted by the cases just cited, is stated in
*Postal-Telegraph Cable Co.* v. *Railroad Com.*, 200 Cal. 463,
at pages 472-473 [254 P. 258], as follows : "This section [536]
constitutes a grant of a franchise which the state offered,
and petitioner accepted by the construction of its lines. The
rights acquired by the Telegraph Company, by accepting
and availing itself of the provisions of the section, are vested
rights which the constitutions, both state and federal, protect.
They cannot be taken away by the state, even though the legis-
lature should repeal the section, or by the people through a
constitutional provision. . . . The finding of the respondent
Commission of the physical fact that petitioner was main-
taining and operating its lines of telegraph over the roads
and highways of the state establishes, as a matter of law and
fact, the proposition that it has accepted and owns a state
franchise for that purpose, which was offered to it by sec-
tion 536, *supra*. . . . The grant, resulting from the acceptance
of the state offer, constituted a contract between the Tele-
graph Company and the state, secured by the constitution
of the United States against impairment by any state legisla-
tion." (See also *City of Beverly Hills* v. *Los Angeles*, 175
Cal. 311 [165 P. 924].)

The prevalence of legislative grants to public utilities of
the privilege of using streets and highways is shown by the
following statement in *State of California* v. *Marin Mun. W.
Dist.*, 17 Cal.2d 699, 703 [111 P.2d 651] : "The right ob-
tained by defendant from these sources is a right conferred
by the legislature to construct and operate pipe lines along
the public highways of the state. Such a grant by the state
to a public utility . . . has always been considered a franchise
by the courts of this state. The right granted to municipal
corporations by the statute of 1923 to use the public highways
was held a franchise in *Los Angeles* v. *South Gate*, 108 Cal.
App. 398 [291 P. 654]. The right granted to public utilities by
article XI, section 19 of the . . . Constitution . . . was held
a franchise in *San Jose Gas Co.* v. *January*, 57 Cal. 614. . . .
The right granted to telephone and telegraph companies

by . . . section 536 [Civ. Code] . . . was held a franchise in *Western Union Tel. Co.* v. *Hopkins,* 160 Cal. 106 [116 P. 557] ; *Sunset Tel. & Tel. Co.* v. *Pasadena,* 161 Cal. 265 [118 P.796], and *Postal-Telegraph Cable Co.* v. *Los Angeles,* 164 Cal. 156 [128 P. 19]. The right granted to irrigation districts by a 1923 statute . . . for power lines was held a franchise in *Winkie* v. *Turlock Irr. Dist.,* 24 Cal.App.2d 1 [74 P.2d 302]."

The courts of other jurisdictions have held that the statutory offer of a franchise when accepted by the construction and operation of a public utility results in a valid contract secured by the federal Constitution against impairment. (*New York Electric Lines Co.* v. *Empire Subway Co.,* 235 U.S. 179, 193 [35 S.Ct. 72, 59 L.Ed. 184] ; *City Railway Co.* v. *Citizens' Street Railroad Co.,* 166 U.S. 557, 567 [17 S.Ct. 653, 41 L.Ed. 1114] ; *Chicago Gen. Ry. Co.* v. *City of Chicago,* 176 Ill. 253, 259 [52 N.E. 880, 68 Am.St.Rep. 188, 66 L.R.A. 959] ; see *State* v. *Southwestern Bell Telephone Co.,* 338 Mo. 617 [92 S.W.2d 612] ; *Arkansas State H. Com'n.* v. *Southwestern Bell T. Co.,* 206 Ark. 1099 [178 S.W. 2d 1002].)

The county seeks to avoid the effect of the long line of cases holding that the acceptance of the offer contained in section 536 and similar statutes resulted in a valid contract by asserting that those cases did not take into consideration the constitutional prohibition against gifts of public property and its historical background. It is argued that sections 22 and 31 of article IV of the state Constitution were enacted to prevent the waste of public funds and property by the appropriation of subsidies to railroads and other corporations, and that the privilege of using the highways for telephone lines is, in effect, a subsidy to a corporation operated for private profit. Although none of the opinions of this court construing section 536 discussed the possible effect of sections 22 and 31 of article IV, it would seem unlikely that the many judges and counsel participating in those cases entirely overlooked the legality of the consideration involved, since that was an essential requisite in each case to the holding that the acceptance of the offer of a franchise resulted in a valid contract.

In support of its contention that a public benefit cannot be a valid consideration for the grant of a limited privilege to use the highways for the construction and maintenance of telephone lines, the county relies upon the case of *Higgins* v. *San Diego Water Co.,* 118 Cal. 524 [45 P. 824, 50 P. 670], asserting that the consideration involved there is identical

with that which must be urged to support the contract in the present case. The city of San Diego subleased from defendant water company its distributing system for the term of 20 years at a fixed monthly rental, and the company agreed as part of the consideration that it would construct a railroad line. The agreement was held to be invalid on the ground that the charter of San Diego conferred no authority upon the council to expend any portion of the municipal funds in aiding the building of railroads. The court expressly declined to determine whether the contract violated the constitutional prohibition against gifts, and the decision therefore is not authority here. There is language in the opinion, however, which intimates that some of the evils which the constitutional restriction was designed to prevent were present in the transaction involved in that case.

Courts in other jurisdictions with similar constitutional prohibitions have held in factual situations comparable to that involved in the Higgins case that the general public benefit derived from the construction of a public utility system is insufficient consideration to support direct appropriations of public money, extensions of public credit, or outright grants of property. (*Lord* v. *Denver*, 58 Colo. 1 [143 P. 284, Ann.Cas. 1916C 893, L.R.A. 1915B 306]; *Colorado Central R. R. Co.* v. *Lea*, 5 Colo. 192; *Southern Railway Co.* v. *Hartshorne*, 162 Ala. 491 [50 So. 139]; *Stone* v. *State*, 223 Ala. 426 [136 So. 727].) On the other hand, the only cases which have considered franchises of the character involved here hold that the grants are valid and do not contravene constitutional prohibitions against gifts. (*State* v. *Southwestern Bell Telephone Co.*, 338 Mo. 617 [92 S.W.2d 612]; *State* v. *Union Electric Co. of Missouri* (Mo.App.), 142 S.W.2d 1099; *Arkansas State H. Com'n.* v. *Southwestern Bell T. Co.*, 206 Ark. 1099 [178 S.W.2d 1002].)

There appears to be some basis for the distinction although it has not been pointed out in the cases. ■ A franchise such as is authorized by section 536 is not an absolute grant in fee or an appropriation of money, but is merely a limited right to use the highways and only to the extent necessary for the furnishing of services to the public. Also, the privilege must be exercised ''in such manner and at such points as not to incommode the public use of the road or highway.'' (Civ. Code, § 536.) It is obvious that the right acquired by the company is of less substance than the transfers involved in

the cited cases which condemn appropriations of money and grants in fee.

Moreover, the state is assured of a continuing benefit in return for the privileges granted under section 536, whereas this may not be true in transactions involving an outright appropriation or transfer in fee. The company must not only construct a telephone system but it must render service, and if it fails to do so the franchise terminates. Thus the state receives benefits during the life of the franchise, since in order to retain it the company must continue to serve the public. If and when the public benefit ceases and the franchise expires, the state is in as good a position as it was before the limited privilege was granted. The building of a public utility and the consequent benefit to the people may not be a sufficient consideration to support a grant in fee, but it does not follow that the benefit received from the construction and continued operation of a telephone system is not an adequate return for the use of the highways so long as the public service continues.

■ Since the offer of a franchise in section 536, when accepted, results in a binding agreement supported by a valid consideration, there is no gift within the meaning of the constitutional prohibitions.

■ It is further urged that section 536, insofar as it applies only to corporations and not to individuals, improperly grants special privileges and invalidly discriminates in favor of corporations. It is asserted that the section violates the equal protection clause of the 14th Amendment to the federal Constitution, and also that it is invalid under article I, sections 11 and 21, and article IV, section 25, subdivisions 19 and 33 of the state Constitution.*

These provisions of the state and federal Constitutions do not prevent classification by the Legislature, nor do they require that statutes operate uniformly with respect to persons

---

*Article I, section 11, provides: "All laws of a general nature shall have a uniform operation."

Article I, section 21, provides: "No special privileges or immunities shall ever be granted which may not be altered, revoked, or repealed by the Legislature; nor shall any citizen, or class of citizens, be granted privileges or immunities which, upon the same terms, shall not be granted to all citizens."

Article IV, section 25, provides: "The Legislature shall not pass local or special laws in any of the following enumerated cases . . . *Nineteenth*—Granting to any corporation, association, or individual any special or exclusive right, privilege, or immunity . . . *Thirty-third*— In all other cases where a general law can be made applicable."

or things which are in fact different. (*People* v. *Western Fruit Growers*, 22 Cal.2d 494 [140 P.2d 13] ; *McCreery* v. *McColgan*, 17 Cal.2d 555 [110 P.2d 1051, 133 A.L.R. 800] ; *In re Fuller*, 15 Cal.2d 425 [102 P.2d 321] ; *Bueneman* v. *City of Santa Barbara*, 8 Cal.2d 405 [65 P.2d 884, 109 A.L.R. 895] ; *Tigner* v. *Texas*, 310 U.S. 141 [60 S.Ct. 879, 84 L.Ed. 1124] ; *Puget Sound Co.* v. *Seattle*, 291 U.S. 619 [54 S.Ct. 542, 78 L.Ed. 1025] ; *Radice* v. *New York*, 264 U.S. 292 [44 S.Ct. 325, 68 L.Ed. 690] ; *Arkansas Nat. Gas Co.* v. *Railroad Com.*, 261 U.S. 379 [43 S.Ct. 387, 67 L.Ed. 705].)

The problem presented by the difference in treatment accorded corporations and individuals under section 536 was directly passed upon in *Western Union Tel. Co.* v. *Hopkins*, 160 Cal. 106 [116 P. 557], and *Postal Tel. Cable Co.* v. *Los Angeles*, 160 Cal. 129 [116 P. 566], where the claim was made that section 536 was invalid because the offer of a franchise contained therein was limited to corporations. In the Hopkins case the court, in holding that there was no violation of the constitutional provisions relating to special legislation, said (p. 122) : "We may reasonably assume that good and sufficient reasons may be apparent to the legislature why the right to exclusively occupy portions of the public highways for the purposes specified should be confined to corporations organized and existing for the purpose of doing a telegraph business, and why such corporations constitute a class to which such a grant may properly be restricted without violating our constitutional provisions against special legislation. If it may reasonably be so assumed the legislation must be upheld, for it is well settled that to warrant a court in adjudging legislation void on this ground it must clearly appear that there was no sufficient reason to warrant the legislative department in finding a difference and making the discrimination. Every presumption is in favor of the validity of an act of the legislature, until its invalidity is made to appear."

Although the Hopkins case makes no specific reference to the equal protection clause of the 14th Amendment, it is clear that the test for determining the validity of a statute where a claim is made that it unlawfully discriminates against any class is substantially the same under the state prohibitions against special legislation and the equal protection clause of the federal Constitution. (*People* v. *Western Fruit Growers*, 22 Cal.2d 494, 506 [140 P.2d 13] ; see *McCreery* v. *McColgan*,

17 Cal.2d 555 [110 P.2d 1051, 133 A.L.R. 800]; *In re Fuller,* 15 Cal.2d 425 [102 P.2d 321]; *Bueneman* v. *City of Santa Barbara,* 8 Cal.2d 405 [65 P.2d 884, 109 A.L.R. 895].) In the Western Fruit Growers case the court, after noting the general rules on this subject, stated: "Problems of classification under the California Constitution are thus similar to those presented by the federal equal protection of the laws clause of the 14th Amendment. Under either provision, the mere production of inequality which necessarily results to some degree in every selection of persons for regulation does not place the classification within the constitutional prohibition. The discrimination or inequality produced, in order to conflict with the constitutional provisions, must be 'actually and palpably unreasonable and arbitrary,' or the legislative determination as to what is a sufficient distinction to warrant the classification will not be overthrown. [Citations.] When a legislative classification is questioned, if any state of facts reasonably can be conceived that would sustain it, there is a presumption of existence of that state of facts, and the burden of showing arbitrary action rests upon the one who assails the classification." (22 Cal.2d 494, 506.)

It is argued, however, that the portion of the opinion in the Hopkins case dealing with the assertedly invalid distinction between individuals and corporations was dictum for the reason that the telegraph company had commenced business and acquired rights under the Constitution of 1849, which contained no inhibition against special legislation. However, in the companion case of *Postal Tel. Cable Co.* v. *Los Angeles,* 160 Cal. 129 [116 P. 566], decided at the same time and controlled by the Hopkins decision, the plaintiff company did not commence business or acquire any rights until after the adoption of the Constitution of 1879, and therefore the issue was necessarily before the court.

The reasons which may have motivated the enactment of section 536 were not discussed in the Hopkins case, but it must be presumed that the Legislature acted in response to a reasonable basis for classification and that the differentiation was based on adequate grounds if any such basis can reasonably be said to exist. There is ample justification for treating corporations differently from individuals in granting franchises for the operation of telephone and telegraph systems, and there is a reasonable basis for the classification of corporations as the sole recipients of the grant offered in section 536. Cor-

porations are in a better position than individuals to finance and carry on statewide projects of this nature, they are more easily regulated and supervised, and they have much greater permanency of existence and can give better assurance of uninterrupted service. It may be that one of the purposes of section 536 was to promote the establishment of statewide communication systems, and the use of corporate ownership and management may have been considered the best method of achieving that purpose.

Statutes similar to section 536, and applying to telephones and telegraphs or to railroads, exist in most of the other states of the Union, but no case has been found in which such a statute was held unconstitutional on the ground of improper discrimination. On the contrary, where the objection has been raised, the power to limit the granting of franchises has been upheld. In *Goddard* v. *Chicago & N. W. Ry. Co.,* 202 Ill. 362 [66 N.E. 1066], an act provided that a street railroad corporation might use the streets and highways outside of cities and towns with the consent of the county board, but did not authorize such use by individuals. It was held that the Legislature by limiting grants to incorporated companies did not violate the state or federal Constitutions. Other courts have held that banking, insurance and similar businesses may be restricted to corporations. (See *Noble State Bank* v. *Haskell,* 219 U.S. 104 [31 S.Ct. 186, 55 L.Ed. 112]; *Shallenberger* v. *First State Bank,* 219 U.S. 114 [31 S.Ct. 189, 55 L.Ed. 117]; *Engel* v. *O'Malley,* 219 U.S. 128 [31 S.Ct. 190, 55 L.Ed. 128]; *Dillingham* v. *McLaughlin,* 264 U.S. 370, 373 [44 S.Ct. 362, 68 L.Ed. 742]; *German Alliance Ins. Co.* v. *Lewis,* 233 U.S. 389, 416 [34 S.Ct. 612, 58 L.Ed. 1011]; *Commonwealth* v. *Vrooman,* 164 Pa. 306 [30 A. 217, 44 Am.St.Rep. 603, 25 L.R.A. 250]; *Brady* v. *Mattern,* 125 Iowa 158 [100 N.W. 358, 106 Am.St.Rep. 291].)

There are general statements in *Frost* v. *Corporation Com.,* 278 U.S. 515 [49 S.Ct. 235, 73 L.Ed. 483], which, detached from their context, may appear to be out of harmony with the authorities cited above. The case, however, is clearly distinguishable. The legislation condemned in that decision exempted agricultural corporations issuing stock and organized for private gain, as well as true cooperatives, from the requirement of making a showing of public necessity in order to obtain a permit to operate a cotton gin. Individuals and other

corporations desiring to engage in the same business for profit were required to make the showing. The corporation involved in the Frost case was an agricultural company issuing stock and organized for private gain. The court intimated that true cooperatives might be properly exempted but held that, in view of the subject dealt with by the legislation, there was no substantial or relevant basis for the differentiation between an agricultural corporation of the type there involved and individuals or other corporations organized for profit. The subject involved in the Frost case is entirely different from that dealt with in section 536. As we have seen, there are sound purposes to be served in encouraging the corporate operation of telephone systems, and the classification complained of cannot, therefore, be said to be unreasonable or arbitrary.

The rule that all presumptions are in favor of the validity of statutes and that a classification made by the Legislature will not be overthrown by the courts unless it is palpably unreasonable has added force when, as here, the statute has been accepted as valid for many years, and vast sums have been invested in reliance upon the rights granted. In *Willard* v. *Glenn-Colusa Irr. Dist.*, 201 Cal. 726 [258 P. 959], where attack was made on the constitutionality of section 55 of the California Irrigation District Act, and the court said (pp. 743-744) : ''It has been upon the statute books of this state for over forty years. While its constitutionality has never been passed upon by this court, this question, so far as our knowledge goes, has never been raised. It is hardly possible that in all the litigation that has been before the courts of this state regarding irrigation districts in their various ramifications, the validity of this provision of the statute would not have been attacked had there been any question of its constitutionality. The fact that no proceeding prior to the present one has ever been brought before this or any of the appellate courts of this state in which the constitutionality of this provision of the statute has been questioned is most convincing proof that the profession as a whole has regarded its validity unassailable.''

Stronger and even more convincing proof may be found in the legal history of section 536. Its provisions relating to telegraph companies have been in existence since 1872, and those applying to telephone companies have been in effect since 1905. The constitutionality of the section has been im-

pliedly upheld by many decisions of this court, and in the few instances where a direct challenge has been made it has withstood the attack. These decisions have been acquiesced in and acted upon for more than 40 years and have become something akin to a rule of property which should not be disturbed in the absence of the most compelling and cogent reasons. We find no such reasons here.

The judgment is affirmed.

Shenk, J., Traynor, J., Schauer, J., and Spence, J., concurred.

Edmonds, J., concurred in the judgment.

CARTER, J.—I dissent.

By permitting section 536 of the Civil Code and the Broughton Act to stand side by side, the majority opinion in effect affirms the holding in *Inyo* v. *Hess*, 53 Cal.App. 415 [200 P. 373], that the two statutes have the effect of giving to telephone and telegraph corporations the right to erect and maintain lines along public highways and streets free of any burden whatsoever while every other person or association must comply with a number of regulations and pay money for the same right. Thus the majority perpetuates the type of special privilege conferred upon corporations which is reminiscent of the decade when this legislation was adopted.

In my opinion, this results in a violation of the equal protection clause of the Fourteenth Amendment to the federal Constitution. While it is clear that the equal protection clause does not prevent a state Legislature from enacting statutes which contain a "reasonable classification," it is equally clear that it does prevent the states from enacting laws which create unreasonable discrimination. The majority opinion asserts that the differentiation here involved is a "reasonable classification." To support this argument, eight cases are cited. (*Goddard* v. *Chicago & N. W. Ry. Co.*, 202 Ill. 362 [66 N.E. 1066]; *Noble State Bank* v. *Haskell*, 219 U.S. 104 [31 S.Ct. 186, 55 L.Ed. 112]; *Shallenberger* v. *First State Bank*, 219 U.S. 114 [31 S.Ct. 189, 55 L.Ed. 117]; *Engel* v. *O'Malley*, 219 U.S. 128 [31 S.Ct. 190, 55 L.Ed. 128]; *Dillingham* v. *Mc-Laughlin*, 264 U.S. 370 [44 S.Ct. 362, 68 L.Ed. 742]; *German Alliance Ins. Co.* v. *Lewis*, 233 U.S. 389 [34 S.Ct. 612, 58 L.Ed. 1011]; *Commonwealth* v. *Vrooman*, 164 Pa. 306 [30 A. 217, 44

Am.St.Rep. 603, 25 L.R.A. 250] ; *Brady* v. *Mattern*, 125 Iowa 158 [100 N.W. 358, 106 Am.St.Rep. 291].)

All eight of these cases involved statutes making distinctions between classes of the public. In all eight of the cases, the statutes were upheld as not violative of the Constitution. But the basis of the holdings in seven of the eight cases was that the statutes constituted an exercise of the police power, so-called. This power of the states to make regulations which, while they abridge the rights of some of the citizens, are nevertheless necessary and justified in the interest of the general public, can be invoked only in cases where there is a danger to the general public. A classification may be validly made when it has a reasonable tendency to combat a specific evil. ". . . [T]o justify the imposition of a burden, there must be some connection of causation or responsibility between the person selected or the right impaired and the danger to the public welfare or the public burden which is sought to be avoided or relieved." (Freund, Police Power, 635.) This element of public danger was present in seven of the cases mentioned. In *Noble State Bank* v. *Haskell*, 219 U.S. 104 [31 S.Ct. 186, 55 L.Ed. 112], the issue was whether anyone desiring to engage in the business of banking could be required to form a corporation, submit to certain inspections and contribute to an insurance or guaranty fund. The evil which this regulation was designed to check was the frequent failure of individuals engaged in the banking business to meet their obligations, and the resulting insecurity of commercial paper, especially checks. The Supreme Court of the United States said: "If the . . . legislature declares . . . that incorporation, inspection and the above-described cooperation are *necessary safeguards*, this court certainly cannot say that it is wrong." (*Noble State Bank* v. *Haskell, supra.*) [Emphasis added.] *Shallenberger* v. *First State Bank,* 219 U.S. 114 [31 S.Ct. 189, 55 L.Ed. 117], involved practically the same situation and is based on the same reasons as the Noble State Bank case. *Engel* v. *O'Malley,* 219 U.S. 128 [31 S.Ct. 190, 55 L.Ed. 128], and *Dillingham* v. *McLaughlin,* 264 U.S. 370 [44 S.Ct. 362, 68 L.Ed. 742], both involved control of a type of business apparently common to New York during the years of heavy immigration. There, individuals would act as depositaries of small savings deposits made by recent immigrants. A substantial number of these depositaries seems to have absconded with the money so deposited and, of course, the low-income, unsophis-

cated depositors were nearly helpless. To eliminate this danger and still enable this particular group of depositors to make their small deposits, various statutory enactments were passed which subjected these individual depositaries to rather strict regulations but exempted from the operation of the regulations banks duly incorporated. Failure on the part of the depositaries to comply with the regulations, such as putting up a bond and submitting to inspections, was made a misdemeanor. Statutes of this type were therefore obviously designed to check an evil and if any further test be needed, the criminal character of the statute is the best indication that the protection of the public was at its basis. In *German Alliance Ins. Co.* v. *Lewis,* 233 U.S. 389 [34 S.Ct. 612, 58 L.Ed. 1011], a statute imposing a number of regulations on insurance companies was attacked on the ground that it expressly exempted farmers' cooperative insurance associations from its regulations. The provisions of the statute were regulatory only and it was held that the classification was entirely reasonable because the members of a cooperative farmers' insurance association are in a far better position to police their own organization than members of the public who deal with unincorporated and unregulated insurers.

The next two cases cited are not binding on this court because they were decided by state courts. But they are equally based on the principle of protection of the public so that they are not only not binding but also inapplicable. *Commonwealth* v. *Vrooman,* 164 Pa. 306 [30 A. 217, 44 Am.St.Rep. 603, 25 L.R.A. 250], was a criminal prosecution under a statute making it a misdemeanor for any person other than a corporation to engage in the insurance business. The decision upholding the distinction is based on the police power and the need of the public for protection. *Brady* v. *Mattern,* 125 Iowa 158 [100 N.W. 358, 106 Am.St.Rep. 291], was a petition for a writ of habeas corpus by a contractor who had been arrested after violating a statute which placed rather stringent controls on individual contractors and required them to put up bonds but exempted corporate contractors and building and loan associations from such controls. The petitioner attacked the constitutionality of the discrimination and the court based its refusal to grant the writ on the fact that the protection necessary to safeguard the public made the classification reasonable.

In the case at bar, there is no pretence that the discrim-

ination is in any way designed to protect the general public from the risks involved if it is permitted to deal with unincorporated telephone and telegraph operators. The absence of this element renders section 536 of the Civil Code unconstitutional. It makes a distinction between private persons and partnerships on one side and telephone and telegraph corporations on the other. This distinction would result in a reasonable classification if public welfare were at all involved. Since public welfare is not involved, the distinction results in a discrimination prohibited by the equal protection clause of the Fourteenth Amendment.

The one case cited in the majority opinion which has not been dealt with does seem to state the rule that the policies behind legislation are not open to inquiry by the courts. *Goddard* v. *Chicago & N. W. Ry. Co.*, 202 Ill. 362 [66 N.E. 1066]. In that case the argument was made that legislation which permitted a county board to issue permits for the construction of railroads to corporations only was in violation of the state and the federal Constitutions. The court brushed this argument aside, saying: "The legislature had power to limit the authority of the county board to grant a license to incorporated companies created . . . for the purpose of constructing and operating street railways, and it is not material what reason existed for prescribing the limit. It was a case for the exercise of legislative judgment with which we are not concerned." (*Goddard* v. *Chicago & N. W. Ry. Co., supra.*) It is submitted that the court was clearly wrong in stating this flat rule. The moment a classification or discrimination is created, the question of whether it shall stand or fall is very much the concern of the courts. It is simply not true that the Legislature can exercise unlimited discretion when it creates such classifications. The majority opinion recognizes this and correctly states the rule that discriminatory legislation must fall unless reasonable and nonarbitrary. The Goddard case, in failing to recognize this rule, would therefore fall even under the view taken by the majority. Besides, being a state case it is not binding here and its persuasive force is dissipated by the case of *Frost* v. *Corporation Com.*, 278 U.S. 515 [49 S.Ct. 235, 73 L.Ed. 483], which controls the Goddard case as well as the case at bar.

The Frost case, *supra,* shows that the result reached by the majority is wrong. The distinction created by section 536, the Broughton Act and the decision in this case is not a rea-

sonable classification: It is an unreasonable discrimination. The present case falls clearly within the rule of the Frost case as it is much stronger on the facts. In the Frost case, a statute required persons and nonagricultural corporations who wished to engage in the ginning of cotton to make a showing of public necessity as a condition precedent to their being able to obtain a license. Cooperative associations were exempt from this requirement. Under the general laws of the state involved, a cooperative association was free to sell its services to the public and make a profit out of such dealings. The court held that the distinction created an unreasonable classification. "... the proviso, as here construed and applied, baldly creates one rule for a natural person and a different and contrary rule for an artificial person, notwithstanding the fact that both are doing the same business with the general public and to the same end, ... it produces a classification which subjects one to the burden of showing a public necessity for his business, from which it relieves the other, and is essentially arbitrary, because based upon no real or substantial differences having reasonable relation to the subject dealt with by the legislation." (*Frost* v. *Corporation Com., supra,* 522.)

In the case at bar, mere enumeration of some of the requirements set forth in the Broughton Act will show that a greater burden results in this case than that of showing a public necessity in the Frost case. Under the Broughton Act, a bidder for a franchise must—unless he is a telephone or telegraph corporation—submit sealed bids, must make immediate payment of a substantial sum if the franchise is struck off to him at the auction, must make an additional large payment within 24 hours, and must pay a tax of 2 per cent on the gross receipts every year. There are other provisions, but those set forth show sufficiently the great disparity created between the privileges enjoyed by corporations under section 536 and those enjoyed by individuals and associations under the Broughton Act.

This classification is unreasonable and discriminatory because nothing is gained through it by anyone including the state, except the corporations which are exempt from the burdens of the Broughton Act. Operators other than those favored few are evidently just as acceptable to the Legislature, provided they pay for the privilege given free to those favored few. Just as in *Frost* v. *Corporation Com., supra,* both

are engaged in exactly the same type of business, for the same purpose. Both would be public utilities. It is obvious, therefore, that no consideration of public welfare could have been in the back of the legislators' minds. No real reason for the classification is shown. The majority opinion indulges in conjecture as to what some of these reasons might have been. That, however, is not a proper solution. The Supreme Court of the United States has laid down the rule that the reasons for the classification must be apparent in order for it to have any chance of being sustained: "To assume that some unnamed public interest exists, which will sustain the discrimination, does not help the matter here; because the assumption can rest only on surmise, with nothing concrete or explicit appearing to support it or to indicate a legislative intent to relate the exemption to any public purpose." (*Colgate* v. *Harvey*, 296 U.S. 404, 425 [56 S.Ct. 252, 80 L.Ed. 299, 102 A.L.R. 54].) The last-cited case involved income tax legislation under which income from investments within the state was favored over that derived from out-of-state investments. The state courts held that such a statute "might" have the purpose of encouraging investments within the state. The Supreme Court answered that contention in the words quoted *supra.* The suppositions made by the majority opinion in the case at bar are open to the same criticism.

Two more points are raised which purportedly lend support to the holding of the majority: One, that the question of constitutionality of these statutes has been before this court and has been decided and that therefore the classification and the subsequent reliance thereon became tantamount to a rule of property which this court should not disturb except for compelling reasons. Literally speaking, the statement that the constitutionality of the combined effect of these statutes has been before this court is true. The statement, however, contains an ambiguous term: "Constitutionality." If this word can be construed to include the state Constitution alone, the statement would be correct. *Western Union Tel. Co.* v. *Hopkins* and its companion cases, 160 Cal. 106 *ff.* [116 P. 557], did pass on the question whether the California Constitution was violated. But the court expressly recognized that nothing more than one single section of the California Constitution had been raised by counsel. The court found that that section had not been violated (art. I, § 11), and discussed one other aspect of the case under the California Constitution. The

federal Constitution was not mentioned. How a holding of this kind can result in a ''rule of property'' is very difficult to conceive. The federal question is before this court for the first time in this case. There is no reason why it should not be squarely met.

The other contention is that no ''compelling and cogent reasons'' exist in this case for a change of the status of telephone and telegraph corporations under what they conceived the law to be. I believe that such reasons do exist. Under the majority holding the counties will receive no revenue out of franchises operated by telephone or telegraph corporations. In order to meet the requirements of the various budgets involved, the tax rate in those counties is therefore correspondingly higher than it would be if these corporations were subjected to the same duty to pay now resting on the balance of the operators. By subjecting telephone and telegraph corporations to the terms of the Broughton Act and by requiring them to make the payments called for by the act, the revenue of the counties will increase and the tax rate will decrease correspondingly. The result will be a higher operating cost for telephone and telegraph corporations. But, contrary to the contention made by these corporations, this will not have any ''disastrous effects'' on them. They are given the means of obtaining permission to charge higher rates (Stats. 1915, p. 115 as amended, 2 Deering's Gen. Laws, Act 6386, § 61 ff.) and will not, as they seem to contend, be driven into bankruptcy. The higher rates which telephone and telegraph corporations may then charge for their services will place the burden of paying for the use of public streets and highways where it belongs: On the subscribers to telephone and telegraph services rather than the taxpayers at large. That, in my opinion, is a reason sufficiently cogent and compelling to make a change, even if a settled situation had existed up to now. Mere lapse of time will never breathe the breath of life into a statute void for unconstitutionality, and the attempt to uphold the statute on this ground evinces a fatal weakness in the basic concept upon which the majority opinion is predicated.

The equal protection clause of the Fourteenth Amendment to the Constitution of the United States has been given renewed vigor by several recent decisions of the Supreme Court of the United States, and in view of this trend I do not anticipate that that court will depart from its pronouncement in

the Frost case which is in clear conflict with the holding of the majority in the case at bar.

It is, therefore, my opinion that the judgment should be reversed.

Appellant's petition for a rehearing was denied September 8, 1948. Carter, J., voted for a rehearing.