[S. F. No. 20060. In Bank. Mar. 17, 1959.]

THE PACIFIC TELEPHONE AND TELEGRAPH COM-
PANY (a Corporation), Appellant, v. CITY AND
COUNTY OF SAN FRANCISCO, Respondent.

Pillsbury, Madison & Sutro, John A. Sutro, Francis N. Marshall and Noble K. Gregory for Appellant.

Dion R. Holm, City Attorney, George E. Baglin and Robert M. Desky, Deputy City Attorneys, for Respondent.

Roger Arnebergh, City Attorney (Los Angeles), Bourke Jones, Assistant City Attorney, and Ralph J. Eubank, Deputy City Attorney, as Amici Curiae on behalf of Respondent.

McCOMB, J.—Plaintiff, hereinafter referred to as "the telephone company," brought an action for declaratory relief to establish its claim of a state franchise to construct and maintain telephone lines in the streets in the city and county of San Francisco. The city and county of San Francisco is hereinafter referred to as "the city."

After trial before the court without a jury, the court found that the construction and maintenance of telephone and telegraph lines on the public streets and other public places located within the city was not a matter of concern to all the people of the State of California, but that the use and occupation of the city streets and other public places by the company's telephone lines was a municipal affair.

The court entered a judgment which determined that the city could exclude from its streets telephone lines essential to the furnishing of communication services to people throughout the State of California, unless the telephone company obtained a franchise from the city.

This is the sole question necessary for us to determine: *Is the construction and maintenance of telephone lines in the streets and other public places within the city today a matter of state concern or a municipal affair under sections 6 and 8 of article XI of the state Constitution?*[1]

---

[1]Section 6 of article XI reads: "Corporations for municipal purposes shall not be created by special laws; but the Legislature shall, by general laws, provide for the incorporation, organization, and classification, in proportion to population, of cities and towns, which laws may be altered, amended, or repealed; and the Legislature may, by general laws, provide for the performance by county officers of certain of the municipal functions of cities and towns so incorporated, when-

We are of the opinion that the construction and maintenance of telephone lines in the streets and other public places within the city is today a matter of state concern and not a municipal affair.

Prior to 1896 the Legislature had plenary authority over all cities and their charters. (*Blanding* v. *Burr*, 13 Cal. 343, 351.) This rule was also applicable to cities which adopted freeholders' charters under the Constitution of 1879 (*Davies* v. *City of Los Angeles*, 86 Cal. 37, 41 [24 P. 771]; *Ex parte Ah You*, 82 Cal. 339, 342 [22 P. 929]) and to cities which continued to operate under a special act adopted prior to 1879 (*Thomason* v. *Ashworth*, 73 Cal. 73, 76 et seq. [14 P. 615]).

In 1896 section 6 of article XI of the Constitution was

---

ever a majority of the electors of any such city or town voting at a general or special election shall so determine. Cities and towns heretofore organized or incorporated may become organized under the general laws passed for that purpose, whenever a majority of the electors voting at a general election shall so determine, and shall organize in conformity therewith. Cities and towns hereafter organized under charters framed and adopted by authority of this Constitution are hereby empowered, and cities and towns heretofore organized by authority of this Constitution may amend their charters in the manner authorized by this Constitution so as to become likewise empowered hereunder, to make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters, and in respect to other matters they shall be subject to and controlled by general laws. Cities and towns heretofore or hereafter organized by authority of this Constitution may, by charter provision or amendment, provide for the performance by county officers of certain of their municipal functions, whenever the discharge of such municipal functions by county officers is authorized by general laws or by the provisions of a county charter framed and adopted by authority of this Constitution."

Section 8 of article XI reads, in part: "(j) In submitting any such charter or amendment separate propositions, whether alternative or conflicting, or one included within the other, may be submitted at the same time to be voted on by the electors separately, and, as between those so related, if more than one receive a majority of the votes, the proposition receiving the largest number of votes shall control as to all matters in conflict. It shall be competent in any charter framed under the authority of this section to provide that the municipality governed thereunder may make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws. It shall be competent in any charter to provide for the establishment of a borough system of government for the whole or any part of the territory of the city or city and county governed thereby, by which one or more boroughs or districts may be created therein and to provide that each borough or district may exercise such general or special municipal powers, and to be administered in such manner, as may be provided for such boroughs and districts in the charter of the city or city and county."

amended to provide a limited amount of autonomy for free-holders' charter cities. It provided that charters "framed or adopted by authority of this Constitution, *except in municipal affairs,* shall be subject to and controlled by general laws." (Italics added.) The city acquired its first freeholders' charter under this amendment, and this was the charter in effect when the telephone company began to render telephone services in the city.

It has been uniformly held that where a freeholders' charter adopted while such amendment was applicable specifically delegated to a city power with respect to particular municipal affairs, such delegated power controlled over general laws, but that if there was no specific charter provision delegating power with respect to a particular subject, the general laws applied within the city even if the subject was a municipal affair. (*Fragley* v. *Phelan,* 126 Cal. 383, 389, 395 [58 P. 923]; *Civic Center Assn.* v. *Railroad Com.,* 175 Cal. 441, 447 et seq. [166 P. 351]; *Stege* v. *City of Richmond,* 194 Cal. 305, 310 [1] et seq. [228 P. 461].)

In 1914 sections 6 and 8 of article XI of the Constitution were amended to give greater autonomy with respect to municipal affairs to cities whose charters were adopted or amended after 1914. After 1914 the city, by appropriate amendment to its charter, acquired autonomy with respect to all municipal affairs except to the extent that its charter limited or restricted such autonomy. (*West Coast Advertising Co.* v. *City & County of San Francisco,* 14 Cal.2d 516, 522 [2] [95 P.2d 138].)

As to matters which are of state concern, however, free-holders' charter cities remained subject to and controlled by general state laws regardless of the provisions of their charters. (Cal. Const., art XI, § 6; *Civic Center Assn.* v. *Railroad Com., supra,* at 445; *Douglass* v. *City of Los Angeles,* 5 Cal.2d 123, 128 [2] [53 P.2d 353].)

Since 1850 the State of California has by statute authorized the construction and maintenance of telegraph lines in the roads, highways and other public places in this state. (*Cf. County of Los Angeles* v. *Southern Calif. Tel. Co.,* 32 Cal.2d 378, 381 [1] [196 P.2d 773].) This statute was codified as section 536 of the Civil Code.[2]

---

[2]The statute now appears as section 7901 of the Public Utilities Code, but it will be referred to in this opinion as section 536 of the Civil Code.

In *Western Union Tel. Co.* v. *Hopkins*, 160 Cal. 106, 114 et seq. [116 P. 557], it was held that section 536 of the Civil Code constituted an offer by the state to telegraph corporations of a franchise to construct and maintain their lines in the highways and other public places within the state, including the streets located in freeholders' charter cities.

In 1905 the Legislature repealed section 536 of the Civil Code and reenacted it to read as follows: "Telegraph or *telephone corporations* may construct lines of telegraph or *telephone lines* along and upon any public road or highway, along or across any of the waters or lands within this state, and may erect poles, posts, piers, or abutments for supporting the insulators, wires, and other necessary fixtures of their lines, in such manner and at such points as not to incommode the public use of the road or highway or interrupt the navigation of the waters." (Italics added.) The legislative intention in reenacting this statute was to extend to telephone corporations the same offer previously made to telegraph corporations without any other change in its effect or operation. (*County of Los Angeles* v. *Southern Calif. Tel. Co., supra* at 382.)

In 1912 the United States Supreme Court in *Pomona* v. *Sunset Tel. & Tel. Co.,* 224 U.S. 330, 344 et seq. [32 S.Ct. 477, 56 L.Ed. 788], held that the legislative intention to extend the offer of a state franchise to telephone corporations had been frustrated by another statute, the Broughton Act (Stats. 1905, chap. 578, p. 777, now Pub. Util. Code, §§ 6001-6017) enacted by the Legislature at the same session at which it had reenacted section 536 of the Civil Code. The Broughton Act provided a procedure for cities and counties to grant franchises "to erect or lay telegraph or telephone wires" in the public streets. The Supreme Court of the United States in this case held that "Until the state court shall decide otherwise," this act must be construed as a delegation by the state to all California cities of the power to grant franchises to California corporations and, therefore, that the Legislature, by enacting the Broughton Act, had repealed section 536 of the Civil Code before it could apply to telephone corporations.

In 1921 the District Court of Appeal in *County of Inyo* v. *Hess,* 53 Cal.App. 415 [200 P. 373] (hearing denied by the Supreme Court), did "decide otherwise" and repudiated the Pomona decision as a misconstruction of California law. The court held that the Broughton Act was purely a procedural statute and did not delegate to cities or counties any substan-

tive authority. This court confirmed the holding of the County of Inyo case in *County of Los Angeles* v. *Southern Calif. Tel. Co.*, *supra*, where we said: "The Broughton Act, unlike section 536, does not grant any right or privilege, nor does it purport to empower or authorize boards of supervisors to grant franchises or other privileges, but instead indicates an intent to limit and restrict the powers which may have been granted under other laws by specifying the procedure which must be followed and the conditions which must be imposed in the granting of any franchises by subordinate legislative bodies." (32 Cal.2d at 383.)

It is now settled that section 536 of the Civil Code constitutes "a continuing offer extended to telephone and telegraph companies . . . which offer when accepted by the construction and maintenance of lines" (32 Cal.2d at 384) gives a franchise from the state to use the public highways for the prescribed purposes without the necessity for any grant by a subordinate legislative body.

It is likewise settled that the constitutional concept of municipal affairs is not a fixed or static quantity. It changes with the changing conditions upon which it is to operate. What may at one time have been a matter of local concern may at a later time become a matter of state concern controlled by the general laws of the state. (*Helmer* v. *Superior Court*, 48 Cal.App. 140, 141 [3] et seq. [191 P. 1001]; *cf. Key System Transit Co.* v. *City of Oakland*, 124 Cal.App. 733, 740 [3] [13 P.2d 979]; *Shean* v. *Edmonds*, 89 Cal.App. 2d 315, 324 [3] [200 P.2d 879]; *People* v. *Western Air Lines, Inc.*, 42 Cal.2d 621, 635 [19] [268 P.2d 723].)

The undisputed evidence in this case discloses that all the communication services provided by the telephone company involve the transmission of intelligence by electrical impulses through its lines.

The telephone company provides direct communication service to the public in California, Oregon, Washington, the northern part of Idaho and, through a subsidiary, in Nevada. In California, either directly or in conjunction with connecting telephone companies, it provides communication service to all the people of the state.

The telephone company, directly or by connecting with the other 49 telephone companies operating in California, makes instantaneous communication available to all the people of the state. Because of the long distance service provided subscrib-

ers of the company and the connecting companies, all the people in this state, by the use of over six million telephones, may communicate by telephone with each other.

Likewise, the people of the United States, by the use of over 60 million telephones, and the people in many parts of the world, may communicate directly with the people in this state, including the residents of the city. In 1957 the telephone company handled 250 million long distance messages in California. Of these, over 18 million were to telephones located in the San Francisco exchange and over 11 million were from telephones in that exchange.

In addition to long distance service, the telephone company provides local telephone service within exchange and extended areas, geographical areas established, pursuant to orders of the Public Utilities Commission of California, to meet the communications requirements of the people residing in those areas. The geographical area of an exchange is based upon a community of business and social interests of people residing in that area, and thus its boundaries do not necessarily conform to the boundaries of cities. For example, the San Francisco exchange includes the cities of San Francisco, Daly City, Colma, parts of Pacifica and South San Francisco, unincorporated areas of San Mateo County, the Presidio, Fort Miley, Fort Funston, Fort Mason, Hunters Point, Treasure Island, Alcatraz Island, Angel Island and the portions of the San Francisco Harbor under the jurisdiction of the San Francisco Port Authority.

An extended area is made up of two or more exchange areas to permit the subscribers in one exchange area to call subscribers in other exchange areas without making long distance calls. Thus, the San Francisco-East Bay extended area includes 30 exchanges serving the residents of 53 cities as well as unincorporated areas located within the counties of Santa Clara, San Mateo, Alameda, Contra Costa and Marin.

In 1957 the telephone company handled almost 6 billion exchange and extended area telephone messages in California, which included 90 million extended area messages between telephones in the San Francisco exchange and the other 29 exchanges in the San Francisco-East Bay extended area.

In addition to long distance, exchange and extended area telephone service, the communication services provided the public by the telephone company include private line telephone, teletypewriter, public mobile telephone, telephoto-

graph, and the transmission of television and radio programs. In order to provide these communication services, the telephone company must maintain telephone lines in the streets located within the city. A communication circuit cannot be established for a subscriber in the city without lines either along or across the streets. The telephone company maintains 9,358 manholes and vaults in the streets and other public places in the city. It also maintains 14,005 telephone poles, 203,000 miles of aerial wire and cable, 1,740.34 miles of underground duct, and over a million miles of underground and buried cable in the streets of the city, all of which are used not only for telephone calls within the city but also for calls throughout California, the United States, and other parts of the world.

If the telephone lines were removed from the streets in the city, the people throughout the state, the United States, and most parts of the world who can now communicate directly by telephone with residents in the city could no longer do so. In addition, the more than 300,000 residents of San Mateo County would be cut off from all long distance telephone communication with the people throughout the state, the nation, and other parts of the world. Without lines in the streets of the city, the telephone company could not provide private line services for agencies of the federal government, such as the Civil Aeronautics Administration, the Federal Communications Commission, the Army, the Navy, and the Air Force.

The private line service afforded over 300 businesses and industries with offices in the city and offices elsewhere in the state or nation would also be cut off if the telephone lines were removed from the streets in the city. For example, the Pacific Coast Stock Exchange, with divisions in Los Angeles and San Francisco, is able to operate as a single exchange only by reason of instantaneous communication between the two divisions, requiring the use of telephone lines in the streets of the city.

Pursuant to its Public Works Code, the city controls the particular location of and manner in which all public utility facilities, including telephone lines, are constructed in the streets and other places under the city's jurisdiction. Before a public utility can make an excavation in any such street or place, it must apply to the city's Department of Public Works for a permit and make a deposit sufficient to

cover the costs of inspection and of restoring the street or place to its original condition, together with incidental expenses of the Department of Public Works in connection therewith. The application of the utility must show the location and approximate area of each excavation and must be approved by the city engineer's office. After the application has been granted, the utility must install its facilities under the supervision of the Department of Public Works and restore the street to as good a condition as it was in before the excavation was made.

Pursuant to these regulations, the telephone company during 1957 obtained from the city's Department of Public Works 65 permits for the installation of poles and 946 excavation permits, and in each case filed an appropriate application, paid the required fee before obtaining the necessary permit, and repaved the streets after the excavations had been completed. The telephone company concedes the existence of power in the city to exact these requirements.

Also, the telephone company concedes that its state franchise can be taxed by the city. The record shows that it paid the city for the fiscal year 1957-1958 nearly $4,000,000 in ad valorem taxes, which payment included taxes on such franchise.

■ Applying the above stated rules of law to the facts of the present case, it is apparent that because of the interest of the people throughout the state in the existence of telephone lines in the streets in the city, the right and obligation to construct and maintain telephone lines has become a matter of state concern. For this reason the city cannot today exclude telephone lines from the streets upon the theory that "it is a municipal affair."

■ When the Legislature in 1905 reenacted Civil Code section 536 to extend to telephone corporations the offer of a state franchise for the construction and maintenance of communication lines, it intended that the offer, like the same offer previously made to telegraph corporations (*Postal Tel.-Cable Co.* v. *Railroad Com.*, 200 Cal. 463, 473 ■ [254 P. 258]), extend and be accepted in its entirety throughout the state (*Pacific Tel. & Tel. Co.* v. *City of Los Angeles*, 44 Cal. 2d 272, 276 [1] [282 P.2d 36]; *City of Petaluma* v. *Pacific Tel. & Tel. Co.*, 44 Cal.2d 284, 287 [2] [282 P.2d 43]; *County of Los Angeles* v. *Southern Calif. Tel. Co., supra*, at page 382).

The offer was made for the purpose of providing the people

of the state with statewide communication services. (*County of Los Angeles* v. *Southern Calif. Tel. Co., supra,* at 384 [3] et seq.)

This conclusion is in accord with other decisions of this court. In *Ex parte Daniels,* 183 Cal. 636, 639 [192 P. 442, 21 A.L.R. 1172], we held that the regulation of traffic on the public streets was a matter of state concern, notwithstanding that such regulation "is of special interest to the people of a municipality."

*Sunset Tel. & Tel. Co.* v. *Pasadena,* 161 Cal. 265 [118 P. 796], relied on by the city in support of its contention that placing telephone lines in the streets of a city is a municipal affair, was decided in 1911. It was held that since Pasadena's charter contained an express delegation of power to grant franchises to telephone corporations to construct and maintain telephone lines in the streets and this was a municipal affair within the meaning of the 1896 amendment to section 6 of article XI of the Constitution, the Legislature's offer of a franchise to telephone corporations in 1905, made by re-enacting section 536 of the Civil Code to include such corporations, did not apply to streets in Pasadena. This case is not controlling now because, as hereinabove stated, the concept of a "municipal affair" is not a fixed quantity but may fluctuate with changing conditions. Accordingly, what may have been a "municipal affair" a half century ago is not necessarily one today.

In 1909, when the case of *Sunset Tel. & Tel. Co.* v. *Pasadena, supra,* was tried, the telephone company had only about 195,000 telephones in use in California. At that time subscribers of one competing company could not speak to subscribers of another. Today the 50 telephone companies providing service in California all connect with each other, as do the other telephone companies throughout the United States, so that the people throughout the State of California, through the use of six million telephones, and the people throughout the United States, through the use of 60 million telephones, may communicate with any telephone subscriber in the city.

In 1909 there was a vast difference in long distance telephone service. No long distance calls from San Francisco could be made to any place south of Los Angeles, north of Portland, or east of Reno. In contrast to the over 3,000 circuits now available for communication between Los Angeles

and San Francisco, in 1909 only two circuits were available and only two conversations could be carried on between those two cities at the same time. In 1909 there was only one circuit north to Portland and one east to Reno. Telephone conversations between San Francisco and those cities frequently would be impaired or impossible because of weather conditions.

In 1909 parties in long distance conversation could not understand each other if they spoke in a normal tone of voice; they had to shout to be heard, and long distance conversations frequently had to be repeated by the operators in order that the parties could understand each other. It was not until 1915, with the opening of the transcontinental telephone line and the development of the vacuum tube repeater, that telephone conversations over any substantial distance became practicable. Today any person throughout the United States and most other parts of the world can talk directly with any telephone subscriber in the city.

Clearly, there has been a vast change in conditions since the decision in *Sunset Tel. & Tel. Co.* v. *Pasadena, supra,* in 1911, and it is evident that telephone service is not at the present time a municipal affair but is a matter of statewide concern.

*Pacific Tel. & Tel. Co.* v. *City of Los Angeles, supra,* 44 Cal. 2d 272, 276 [3], is not applicable here for this reason:

The principal issue in that case was whether the telephone company held a state franchise under section 536 of the Civil Code to construct and maintain its lines and equipment on the streets and other public places located within all areas which have been annexed to or consolidated with the city since 1905. The telephone company did not contend in the trial court that the city had no power to require a franchise for use of the streets within the 1905 boundaries of the city, and the statement in the opinion on that subject (44 Cal.2d at pp. 276-277) merely recognized the rule which had been applied in *Sunset Tel. & Tel. Co.* v. *Pasadena,* 161 Cal. 265 [118 P. 796].

 *City of San Diego* v. *Southern Calif. Tel. Co.,* 92 Cal. App.2d 793 [208 P.2d 27], also relied on by the city, wherein the court held that the construction and maintenance of telephone lines in streets is not a matter of state concern but is a municipal affair, is contrary to the views hereinabove expressed and is therefore disapproved.

In view of our conclusions, it is unnecessary to discuss other contentions made by counsel.

The judgment is reversed.

Gibson, C. J., Traynor, J., Schauer, J., and Spence, J., concurred.

Respondent's petition for a rehearing was denied April 15, 1959. Shenk, J., was of the opinion that the petition should be granted.